# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE WILLIAMS COMPANIES, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 12168-VCG |
| | ) | |
| ENERGY TRANSFER LP, formerly | ) | |
| known as ENERGY TRANSFER | ) | |
| EQUITY, L.P., and LE GP, LLC, | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |
| | ) | |
| | ) | |
| THE WILLIAMS COMPANIES, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 12337-VCG |
| | ) | |
| ENERGY TRANSFER LP, formerly | ) | |
| known as ENERGY TRANSFER | ) | |
| EQUITY, L.P., ENERGY TRANSFER | ) | |
| CORP LP, ETE CORP GP, LLC, LE GP, | ) | |
| LLC and ENERGY TRANSFER | ) | |
| EQUITY GP, LLC, | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  September 23, 2021
Date Decided:  December 29, 2021

Kenneth J. Nachbar, Susan W. Waesco, and Matthew R. Clark, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Antony L. Ryan, Kevin J. Orsini, Michael P. Addis, and David H. Korn, of CRAVATH, SWAINE & MOORE LLP, New York, New York, *Attorneys for Plaintiff and Counterclaim Defendant The Williams Companies, Inc.*

Rolin P. Bissel, James M. Yoch, Jr., and Alberto E. Chávez, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Michael C. Holmes, John C. Wander, Craig E. Zieminski, and Andy E. Jackson, of VINSON & ELKINS LLP, Dallas, Texas, *Attorneys for Defendants and Counterclaim Plaintiffs Energy Transfer LP, formerly Energy Transfer Equity, L.P.; Energy Transfer Corp LP; ETE Corp GP, LLC; LE GP, LLC; and Energy Transfer Equity GP, LLC.*

**GLASSCOCK, Vice Chancellor**

This matter first came before me on Plaintiff The Williams Companies, Inc.'s ("Plaintiff" or "Williams") motion to specifically enforce a merger agreement (the "Merger") with Defendant Energy Transfer LP ("ETE"). Between signing and closing, market conditions changed, making the Merger less favorable to ETE, to the point that ETE's CEO and board chairman, Kelcy Warren, foresaw a credit-ratings downgrade and regretted agreeing to the Merger. The same market conditions caused the failure of a condition precedent: that Latham & Watkins be able to certify that the Merger was structured in such a way that it should be a tax-free exchange of partnership units (the "721 Opinion").

In 2016, Williams sued to prevent ETE from terminating the merger agreement due to the failure of this condition. Despite recognizing that ETE wanted out of the merger agreement, I determined that the failure of the condition precedent independently gave ETE an exit right. Left in the case was Williams' pursuit of a contractual breakup fee.[1] In denying specific performance, I noted ETE's strong desire not to close, but also that "even a desperate man can be an honest winner of the lottery," analogizing such luck to the tax-representation-out that had presented itself. In this action for liquidated damages, however, I also note that even this lucky winner must face the tax man. Having called a dirge for the Merger, ETE must pay

---

[1] As detailed below, Williams and ETE negotiated a $410 million reimbursement that ETE was required to pay Williams in the event that the Merger failed and certain conditions were met.

the piper. For the reasons given below, I find that ETE is contractually obligated to pay the breakup fee.

## I. BACKGROUND[2]

The facts recited in this post-trial Opinion are the Court's findings based on the record presented at trial. The following facts were either uncontested or proven by a preponderance of the evidence. "The reader is forewarned that this case involves a maze of corporate entities and an alphabet soup of corporate names."[3] This Opinion includes only those facts necessary to my analysis.

### A. The Parties

Plaintiff and Counterclaim Defendant Williams is a Delaware corporation with its principal executive offices located in Tulsa, Oklahoma.[4] Williams is a North American energy company focused on providing infrastructure to deliver natural gas products to market.[5] Williams owns and operates interstate natural gas pipelines and gathering and processing operations throughout the country.[6] Williams stock is traded on the New York Stock Exchange (the "NYSE") under the symbol "WMB."[7]

---

[2] Where the facts are drawn from exhibits jointly submitted at trial, they are referred to according to the numbers provided on the parties' joint exhibit list and with page numbers derived from the stamp on each JTX page ("JTX-__.__").

[3] *Williams Cos., Inc. v. Energy Transfer Equity*, 2017 WL 5953513 (Del. Ch. Dec. 1, 2017) (quoting *Chester Cnty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2017 WL 4461131, at *1 (Del. Ch. Oct. 6, 2017)).

[4] Pre-Trial Stipulation and Order, Dkt. No. 577 ¶ 10 [hereinafter "Stip."].

[5] *Id.*

[6] *Id.*

[7] *Id.*

Williams is a party to the Agreement and Plan of Merger entered on September 28, 2015 (the "Merger Agreement").[8]

Defendant and Counterclaim Plaintiff Energy Transfer LP, formerly known as Energy Transfer Equity, L.P.,[9] is a Delaware limited partnership with its principal executive offices located in Dallas, Texas.[10] ETE's family of companies owns and operates approximately 71,000 miles of natural gas, natural gas liquids, refined products and crude oil pipelines.[11] ETE's common units are traded on the NYSE under the symbol "ET."[12]

Defendant and Counterclaim Plaintiff Energy Transfer Corp LP ("ETC") is a Delaware limited partnership taxable as a corporation.[13] Pursuant to the Merger, Williams would have merged with and into ETC.[14] ETC is a party to the Merger Agreement and would have been the managing member of the general partner of ETE following the consummation of the Merger.[15]

---

[8] *Id.*
[9] On October 19, 2018, Energy Transfer, L.P. changed its name to "Energy Transfer LP." *Id.* ¶ 12. The parties agree that Energy Transfer Equity, L.P. is the same entity as Energy Transfer LP for the purposes of this litigation. *Id.*
[10] *Id.* ¶ 11.
[11] *Id.*
[12] *Id.*
[13] *Id.* ¶ 13.
[14] *Id.*
[15] *Id.*

Defendant and Counterclaim Plaintiff ETE Corp GP, LLC is a Delaware limited liability company, the general partner of ETC, and a party to the Merger Agreement.[16]

Defendant and Counterclaim Plaintiff LE GP, LLC ("LE GP") is a Delaware limited liability company, the general partner of ETE, and a party to the Merger Agreement.[17]

Defendant and Counterclaim Plaintiff Energy Transfer Equity GP, LLC ("ETE GP") is a Delaware limited liability company and a party to the Merger Agreement.[18] Pursuant to the Merger, ETE GP would have merged with LE GP such that ETE GP would have been the surviving company and general partner of ETE.[19]

Unless otherwise specified, I refer to these Defendants and Counterclaim Plaintiffs collectively as "ETE."

*B. Factual Background*

### 1. Williams Agrees to the WPZ Roll-Up

Before ETE submitted an offer to purchase Williams, Williams entered into an agreement to undertake a separate roll-up transaction with its master limited

---

[16] *Id.* ¶ 14.
[17] *Id.* ¶ 15.
[18] *Id.* ¶ 16.
[19] *Id.*

partnership, Williams Partners, L.P. ("WPZ").[20]  The Williams Board approved the WPZ transaction on May 12, 2015.[21]  Williams and WPZ executed the transaction documents that day, and the next day, May 13, 2015, they issued a joint press release announcing the execution of the agreement.[22]  The WPZ agreement required Williams to pay WPZ a termination fee of $410 million if it later terminated the WPZ transaction.[23]

At the time the WPZ transaction was announced, ETE had not made a formal offer to purchase Williams, though it had expressed interest in doing so. Specifically, on May 6, 2015, a week before the WPZ transaction was announced, ETE's Chief Executive Officer ("CEO"), Kelcy Warren, hosted a dinner at his home with Williams' CEO, Alan Armstrong, Williams' Chief Financial Officer ("CFO") Don Chappel, and ETE's then-CFO, Jamie Welch for the purpose of asking whether Williams would be interested in a merger with ETE.[24]  Warren did not make a formal offer to purchase Williams at this dinner,[25] nor had he decided whether he wanted to make an offer.[26]  Warren did not propose a price term for a potential offer,[27] but

---

[20] JTX-1218.0130.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Trial Tr. at 137:21–138:3(Chappel); *id.* at 313:23–314:3(Warren).
[25] *Id.* at 138:4–6(Chappel).
[26] *Id.* at 312:15–314:19(Warren).
[27] *Id.* at 138:7–9(Chappel).

5

Welch did outline a potential transaction structure.[28] Armstrong did not brief the Williams board of directors (the "Williams Board") about the dinner.[29]

### 2. The Parties Negotiate the Merger Agreement

On May 19, 2015, ETE submitted a bid to purchase Williams in an all-equity deal.[30] As a condition to its offer, ETE required Williams to terminate the roll-up transaction with WPZ, which, as detailed above, would require Williams to pay WPZ a $410 million termination fee.[31] Negotiations proceeded through the summer of 2015.[32] Williams was represented by Cravath, Swaine & Moore ("Cravath"), and ETE was represented by Wachtell, Lipton, Rosen & Katz ("Wachtell"). The Williams Board formed a Strategic Review Administration Committee to evaluate and oversee a potential sale.[33]

#### a. Economic Equivalence Was "Paramount" to Williams

The Merger contemplated an "Up-C" structure, in which Williams stockholders would receive shares in a new entity, ETC, instead of receiving ETE common units directly.[34] The Williams Board was therefore concerned that ETC shares could trade at a discount to ETE common units.[35] The Williams Board was

---

[28] *Id.* at 601:24–602:6(Armstrong).
[29] *Id.* at 603:1–3(Armstrong).
[30] Stip. ¶ 17.
[31] JTX-0202.0004.
[32] Stip. ¶ 17.
[33] JTX-1218.0134.
[34] JTX-0026.0004.
[35] *E.g.*, Trial Tr. at 18:10–15(Chappel); *id.* at 316:24–317:9(Warren).

likewise concerned that, because Warren personally owned a significant number of ETE units and would control both ETE and ETC after the Merger, he might take actions that benefitted ETE at ETC's expense.[36]

As a result, achieving economic equivalence between the ETE common units and the ETC shares was a key point of negotiation. Warren wrote to the Williams Board in a June 18, 2015 letter that Williams "stockholders would receive common shares in [ETC] that would mirror the economic attributes of ETE common units."[37] Chappel testified at trial that "economic equivalence was paramount" and that there was "engineering that was done to ensure that" ETE common units and ETC shares "traded as closely as we possibly could."[38] Warren admitted at trial that "equality of distributions between ETC shares and ETE units was a key aspect of the merger."[39] Al Garner, a financial advisor to Williams from Lazard, testified that bargaining for economic equivalence was "the subject of most of the negotiations on the transaction" and "the most important and time-consuming part of the[] negotiations."[40] Garner further testified that in the final months leading up to the execution of the merger agreement, economic equivalence took up the "lion's share of the negotiation."[41]

---

[36] Trial Tr. at 482:9–483:2(McReynolds); *id.* at 605:7–22(Armstrong); JTX-1218.0161.
[37] JTX-0026.0004.
[38] Trial Tr. at 18:24–19:3(Chappel).
[39] *Id.* at 316:24–318:17(Warren).
[40] *Id.* at 146:11–147:6(Garner).
[41] *Id.* at 147:24–148:3(Garner).

7

As a result, the Merger Agreement featured various terms that were designed to achieve economic equivalence. For instance, the parties agreed that ETC would pay dividends on ETC shares that were equal to distributions paid on ETE common units through 2018.[42] In addition, ETE agreed to provide ETC stockholders with an equalizing payment at the end of two years if ETC shares traded at a discount to ETE common units.[43] Finally, the parties agreed to replace a portion of the all-equity consideration with a $6.05 billion cash payment that would be used by ETE to purchase shares in ETC, known as "hook stock," which ensured that ETE's and ETC's interests were aligned.[44] ETC would distribute this consideration to its stockholders, formerly Williams stockholders.[45]

### 3. The Merger Agreement

The parties executed the Merger Agreement on September 28, 2015.[46] Following the consummation of the Merger, ETC would own Class E Units representing approximately 57% of the limited partner interest of ETE, and the existing limited partners of ETE would own the remaining approximately 43% limited partner interest.[47] ETE would own the Williams assets, as well as

---

[42] JTX-0189.0006–.0007 (§5.15(b)(iii)); Trial Tr. at 19:5–20:16(Chappel); *id.* at 146:11–147:14(Garner); *id.* at 317:24–318:5(Warren).
[43] Trial Tr. at 19:5–20:16(Chappel).
[44] *Id.* at 20:17–21:7(Chappel); *id.* at 147:7–14(Garner); *id.* at 418:19–422:1(Welch); *id.* at 988:16–989:3(Needham); *id.* at 1230:23–12:31:1(Whitehurst).
[45] Stip. ¶ 18.
[46] *Id.* ¶ 17. *See also* JTX-0209.
[47] Stip. ¶ 18.

approximately 19% of the outstanding ETC shares.[48] The former Williams stockholders would own the remaining approximately 81% of the ETC shares and would receive approximately $6.05 billion in cash consideration.[49] Williams and ETE eventually agreed to a Closing Date of June 28, 2016 at 9:00 AM.[50]

The Merger Agreement featured several provisions that are at issue in this litigation, including a Capital Structure Representation, an Ordinary Course Covenant, and three Interim Operating Covenants.

### a. The Capital Structure Representation

Under the Merger Agreement, ETE represented at signing that its capital structure was composed of three classes of equity securities—common units and Class D Units representing limited partnership interests in ETE, and a general partner interest in ETE—as well as the number of outstanding units in each class and the percentage of the general partner interest (the "Capital Structure Representation"):

> Capital Structure. (i) The authorized equity interests of Parent consist of common units representing limited partner interests in Parent ("Parent Common Units"), Class D Units representing limited partner interests in Parent ("Parent Class D Units") and a general partner interest in Parent ("Parent General Partner Interest"). At the close of business on September 25, 2015 (the "Parent Capitalization Date"), (i) 1,044,764,836 Parent Common

---

[48] *Id.*
[49] *Id.*
[50] *Id.* ¶ 34.

9

Units were issued and outstanding, of which 5,776,462 consisted of Parent Restricted Units, (ii) 2,156,000 Parent Class D Units were issued and outstanding and (iii) there was an approximate 0.2576% Parent General Partner Interest. Except as set forth above, at the close of business on the Parent Capitalization Date, no equity securities or other voting securities of Parent were issued or outstanding.[51]

The parties agreed that the representation regarding the three existing classes of equity—but not the representation regarding the number of outstanding units—would be brought down to closing, "except for any immaterial inaccuracies":

> The representations and warranties of the Company set forth in Sections 3.01(c)(i) [] (Capital Structure) shall be true and correct as of the Closing Date as though made on such date (except to the extent any of such representations and warranties speak as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), except for any immaterial inaccuracies.[52]

Therefore, if ETE issued more units within its existing classes between signing and closing, the representation would remain true. If, however, ETE created a new class of equity interests, the representation would no longer be true at closing. The Capital Structure Representation was a "key element . . . in addressing the [Williams] [B]oard's concerns about economic equivalence" because it ensured that ETE could not "issue a new security with rights that shifted value from what was

---

[51] JTX-0209.0030 (§3.02(c)(i)). The Merger defines "Parent" to mean ETE, and "TopCo" to mean ETC. JTX-0209.0004.

[52] *Id.* at .0063 (§6.03(a)(i)).

expected and what was modeled," which could result in "a deal that was quite a bit different than the deal that was bargained for."[53]

### b. The Ordinary Course and Interim Operating Covenants

ETE agreed to several covenants in the Merger Agreement regarding its conduct between signing and closing, four of which are at issue here. Each of these covenants are subject to exceptions, discussed below, identified in the Parent Disclosure Letter for Agreement and Plan of Merger (the "Parent Disclosure Letter").

First, ETE agreed to operate its business "in the ordinary course" (the "Ordinary Course Covenant"):

> *Except as set forth in Section 4.01(b) of the Parent Disclosure Letter*, expressly permitted by this Agreement, required by applicable Law or consented to in writing by the Company (such consent not to be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement to the Effective Time, *Parent shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary course* and shall use commercially reasonable efforts to preserve substantially intact its current business organizations, maintain its rights, franchises and Parent Permits and to preserve its relationships with significant customers and suppliers.[54]

The "ordinary course" obligation in turn entailed several specific restrictions on ETE between signing and closing (the "Interim Operating Covenants"). As with

---

[53] Trial Tr. at 204:19–205:3(Van Ngo); *id.* at 28:3–11(Chappel).
[54] JTX-0209.0045 (§4.01(b)) (emphasis added).

11

the general Ordinary Course Covenant, the Interim Operating Covenants were subject to exceptions provided in the Parent Disclosure Letter:

> Without limiting the generality of the foregoing, *except as set forth in Section 4.01(b) of the Parent Disclosure Letter*, expressly permitted by this Agreement, required by applicable Law or consented to in writing by the Company (such consent not to be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement to the Effective Time, Parent shall not, and shall not permit any of its Subsidiaries to . . . .[55]

Three of the Interim Operating Covenants are at issue here. First, ETE agreed that it would not take any actions resulting in new restrictions on distributions and payments of dividends:

> [Parent shall not, and shall not permit any of its Subsidiaries to] take any action that would result in Parent or any of its Subsidiaries becoming subject to any restriction not in existence on the date hereof with respect to the payment of distributions or dividends[.][56]

Second, ETE agreed to refrain from certain actions regarding its equity securities:

> [Parent shall not, and shall not permit any of its Subsidiaries to] split, combine or reclassify any of its equity securities or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for equity securities, other than transactions by a wholly owned Subsidiary of Parent which remains a wholly owned Subsidiary after consummation of such transaction[.][57]

---

[55] *Id.* (emphasis added).
[56] *Id.* at .0045 (§4.01(b)(ii)).
[57] *Id.* at .0045 (§4.01(b)(iii)).

Third, ETE agreed not to amend certain organizational documents:

> [Parent shall not, and shall not permit any of its Subsidiaries to] amend (A) the organizational documents of TopCo, (B) the Parent Certificate of Partnership or the Parent Partnership Agreement (other than the Parent Partnership Agreement Amendment) or (C) the comparable organizational documents of any Subsidiary of Parent in any material respect[.][58]

Section 6.03(b) of the Merger Agreement required ETE to have "performed or complied" with each of the Ordinary Course Covenant and the Interim Operating Covenants "by the time of the Closing" "in all material respects":

> <u>Performance of Obligations of TopCo and Parent</u>. Each of TopCo and Parent shall have, in all material respects, performed or complied with all obligations required by the time of the Closing to be performed or complied with by it under this Agreement, and the Company shall have received a certificate signed on behalf of Parent by the chief executive officer or the chief financial officer of Parent to such effect.[59]

These covenants were designed to ensure that, between signing and closing, "the deal that was struck [wa]s preserved through the closing date" and were "part of the package of protections that the [Williams B]oard requested to address their concerns around economic equivalence."[60]

---

[58] *Id.* at .0046 (§4.01(b)(vi)).
[59] *Id.* at .0063 (§6.03(b)).
[60] Trial Tr. at 21:8–23(Chappel); *id.* at 203:8–23(Van Ngo).

### c. The Parties Negotiate the $1 Billion Equity Issuance Exception

As I noted above, the Ordinary Course Covenant and each of the Interim Operating Covenants were subject to exceptions "set forth in Section 4.01(b) of the Parent Disclosure Letter."[61] Section 4.01(b) of the Parent Disclosure Letter, in turn, identifies these exceptions.[62] The exceptions are organized under headers that correspond to specific sections within Section 4.01(b) of the Merger Agreement.[63] Under the header "Section 4.01(b)(v)," the Parent Disclosure Letter states, "Parent may make issuances of equity securities with a value of up to $1.0 billion in the aggregate" (the "$1 Billion Equity Issuance Exception").[64]

The parties dispute whether the $1 Billion Equity Issuance Exception applies to all of the Ordinary Course and Interim Operating Covenants, or just the Interim Operating Covenant located within Section 4.01(b)(v) of the Merger Agreement, which prohibits ETE from issuing equity between signing and closing. The transaction documents include two provisions that are relevant to this interpretive question. First, the Parent Disclosure Letter states that "[t]he headings contained in this Parent Disclosure Letter are for reference only and shall not affect in any way

---

[61] JTX-0209.0045 (§4.01(b)).

[62] JTX-0194.0017–.0019.

[63] *Id.* Specifically, there are headers titled, "Section 4.01(b)(i)," "Section 4.01(b)(ii)," "Section 4.01(b)(v)," "Section 4.01(b)(vii)," "Section 4.01(b)(ix)," "Section 4.01(b)(x)," "Section 4.01(b)(xi)," "Section 4.01(b)(xii)," and "Section 4.01(b)(xiii)." *Id.*

[64] *Id.* at .0018.

the meaning or interpretation of this Parent Disclosure Letter."[65] Second, the Merger Agreement includes a savings clause stating that the disclosures in any section of the Parent Disclosure Letter apply to the corresponding section of the Merger Agreement, as well as to any other section of the Merger Agreement so long as the "relevan[ce]" to the other section "is reasonably apparent on its face":

> [A]ny information set forth in one Section or subsection of the Parent Disclosure Letter shall be deemed to apply to and qualify the Section or subsection of this Agreement to which it corresponds in number and each other Section or subsection of this Agreement to the extent that it is reasonably apparent on its face in light of the context and content of the disclosure that such information is relevant to such other Section or subsection[.][66]

The parties also introduced extrinsic evidence at trial regarding their intent with respect to these exceptions. Since the initial drafts, the Merger Agreement had included a prohibition on issuing equity between signing and closing.[67] ETE then proposed adding the $1 Billion Equity Issuance Exception directly into this prohibition, rather than adding it into the Parent Disclosure Letter.[68] The $1 Billion Equity Issuance Exception was negotiated by Chappel and Welch, the CFOs for both parties.[69] As the parties exchanged subsequent drafts, the $1 Billion Equity Issuance Exception remained directly within the equity issuance covenant of the Merger

---

[65] *Id.* at .0002.
[66] JTX-0209.0030 (§3.02).
[67] JTX-0056.0064 (§5.2(b)(xi)); JTX-0058.0047 (§4.01(b)(iv)).
[68] JTX-0064.0170–.0171 (§4.01(b)(iv)(A)); Trial Tr. at 408:19–409:1(Welch).
[69] Trial Tr. at 22:8–15(Chappel); *id.* at 404:15–405:1(Welch).

15

Agreement, instead of the Parent Disclosure Letter.[70]  Chappel and Welch both testified that they both understood the $1 Billion Equity Issuance Exception to apply only to the Interim Operating Covenant prohibiting equity issuances in Section 4.01(b)(v).[71]

The day before signing, on September 27, 2015, Williams and ETE each moved several exceptions that had been drafted into individual covenants in the Merger Agreement to their respective disclosure letters.[72]  When the parties did so, they tied each exception to the corresponding Interim Operating Covenant from which it had been moved through the use of headers identifying those individual covenants by section.[73]  The $1 Billion Equity Issuance Exception was one of the exceptions that ETE moved into its Parent Disclosure Letter.[74]  ETE removed the $1 Billion Equity Issuance Exception from Section 4.01(b)(v) of the Merger Agreement and placed it under a header in Section 4.01(b) of the Parent Disclosure Letter titled, "Section 4.01(b)(v)."[75]

---

[70] *E.g.*, JTX-0146.0003; Tr.211:17–212:19(Van Ngo).
[71] Trial Tr. at 24:2–25:7(Chappel); *id.* at 409:2–413:5(Welch).
[72] *Compare* JTX-0139.0055–.0061, *with* JTX-0160.0029–.0032 (moving exceptions from Merger Agreement §4.01(a) to Company Disclosure Letter); *compare* JTX-0162.0175–.0179, *with* JTX-0167.0019–.0021 (moving exceptions from Merger Agreement §4.01(b) to Parent Disclosure Letter).
[73] *See* JTX-0160.0029–.0032 (Company Disclosure Letter); JTX-0162.0175–.0179 (Parent Disclosure Letter).
[74] JTX-0194.0018.
[75] *Compare* JTX-0162.0176 (Merger Agreement §4.01(b)(v)), *with* JTX-0167.0020 (Parent Disclosure Letter).

The evidence presented at trial established that the parties moved the exceptions into the disclosure letters to maintain their confidentiality, and that they did not intend the moves to be substantive. Chappel testified at trial that the exceptions were moved to the disclosure letters "to maintain confidentiality" with respect to "sensitive issues," and that they intended "no change in rights."[76] Welch agreed that the exceptions were moved for confidentiality reasons.[77] Likewise, Minh Van Ngo, the Cravath attorney advising Williams on the Merger, testified that Cravath told Wachtell at that time "that we were fine with th[e] movement, with the understanding that it was nonsubstantive," meaning, "just like it operate[d] if it were in the body of the merger agreement, . . . the exceptions in the disclosure schedule would apply only to the corresponding section of the merger agreement."[78] Van Ngo also testified that he told Wachtell that he understood the disclosure letters to be "section-specific."[79]

---

[76] Trial Tr. at 25:12–26:6(Chappel).
[77] *Id.* at 415:19–416:5(Welch).
[78] *Id.* at 213:13–21(Van Ngo).
[79] *Id.* at 215:3–8 (Van Ngo). Although David Katz, one of ETE's deal counsel at Wachtell, testified in a deposition that he believed the $1 Billion Equity Issuance Exception applied to each of the covenants within Section 4.01(b) of the Merger Agreement, he admitted that he was not involved in drafting the Parent Disclosure Letter and that he did not know how his team determined the structure of the exceptions in the letter. Katz Dep. at 88:21–91:25. Rather, his interpretation was based solely on his reading of the Merger Agreement and Parent Disclosure Letter on the day of the deposition. *Id.* Accordingly, I find this testimony to be unpersuasive regarding the parties' intent.

17

Van Ngo also testified that he told Wachtell he preferred the "'reasonably apparent on its face' formulation for the savings clause" and Wachtell responded, "[t]hat's fine."[80]  Van Ngo testified that he understood the "reasonably apparent on its face" formulation was meant "to address obvious drafting errors and[/]or manifest errors on the parties" because "when you move sections . . . to a disclosure schedule," "there's a heightened risk that you have misalignment of the sections or that . . . you miss . . . certain cross references."[81]

In addition, the parties' conduct after signing the Merger Agreement further demonstrates that they intended the exceptions that were moved into the disclosure letters to apply only to the specific covenants from which they were moved.  After signing, Williams planned its own equity issuance.[82]  Like ETE, Williams was also subject to a restriction on the issuance of equity,[83] and its Company Disclosure Letter included an exception permitting Williams to issue up to $1 billion in equity securities.[84]  And like the Parent Disclosure Letter, the Company Disclosure Letter was structured so that each exception fell under a header that corresponded to a specific covenant in the Merger Agreement.[85]

---

[80] Trial Tr. at 215:3–8(Van Ngo).
[81] *Id.* at 215:3–23 (Van Ngo).
[82] *Id.* at 29:13–32:10(Chappel); *id.* at 416:6–417:18(Welch); JTX-0246.0001–.0002.
[83] JTX-0209.0042 (§4.01(a)(v)).
[84] JTX-0196.0025.
[85] *Id.* at .0025–.0029.

Although Williams was therefore permitted to issue equity under this Company Disclosure Letter exception, the particular issuance that Williams planned involved the waiver of incentive distribution rights ("IDRs"),[86] which was prohibited by a separate interim operating covenant.[87] Accordingly, before going forward with the planned issuance, Williams requested ETE's consent to the waiver of IDRs.[88] ETE refused to consent, and Williams did not proceed with the issuance.[89] If the parties had intended the $1 billion equity issuance exception in the Company Disclosure Letter to apply to all of Williams' interim operating covenants, rather than just the equity issuance covenant, ETE's consent would not have been required.

### d. The Merger Agreement Was Conditioned on a Tax Opinion

The Merger Agreement was conditioned on ETE's tax counsel, Latham & Watkins LLP ("Latham"), rendering the 721 Opinion—that the contribution by ETC of the Williams assets to ETE in exchange for the issuance of Class E units "should" be treated as tax free under Section 721 of the Internal Revenue Code.[90]

The Merger Agreement also included certain representations and covenants related to the Section 721 tax treatment. First, ETE represented that it did not "know[] of the existence of any fact that would reasonably be expected to prevent"

---

[86] Trial Tr. at 29:13–33:13(Chappel); *id.* at 416:6–417:23(Welch); JTX-0246.0001–.0002.
[87] JTX-0209.0043 (§4.01(a)(x)).
[88] Trial Tr. at 32:11–33:13(Chappel); *id.* at 417:2–18(Welch); JTX-0246.0001–.0002.
[89] Trial Tr. at 33:14–20(Chappel); *id.* at 417:19–23(Welch).
[90] JTX-0209.0062 (§6.01(h)).

the Merger "from qualifying as an exchange to which Section 721(a) of the Code applies."[91]  This representation was brought down to closing, subject to the "Parent Material Adverse Effect" materiality standard.[92]  Williams also made a reciprocal representation, which was also brought down to closing, subject to a "Company Material Adverse Effect" materiality standard.[93]  Second, the Merger Agreement included covenants that required ETE and Williams to use reasonable best efforts to consummate the Merger and commercially reasonable efforts to cause the contribution to qualify as tax-free under Section 721(a).[94]

### 4. The Williams Board Approves the Merger

Following negotiations, the Williams Board met on September 24 and 25, 2015 to discuss the Merger.[95]  At the September 24, 2021 meeting, the Board took a "straw poll" and preliminarily rejected the Merger by a 6-to-7 vote.[96]  The next day, two Williams directors—Janice Stoney and Joe Cleveland—changed their votes, and the Board voted to approve the Merger 8-to-5.[97]

ETE contends that threats of a consent solicitation from two activist directors on the Williams Board, Keith Meister and Eric Mandelblatt, were a significant factor

---

[91] *Id.* at .0038 (§3.02(n)(i)).
[92] *Id.* at .0063 (§6.03(a)(iv)).
[93] *Id.* at .0026 (§3.01(n)(i)), .0062 (§6.02(a)(iv)).
[94] *Id.* at .0053 (§5.03), .0060 (§5.07).
[95] JTX-0137.
[96] *Id.* at .0005.
[97] *Id.* at .0006.

in the Williams Board's decision to approve the Merger.[98]  The evidence presented at trial, however, established that Meister and Mandelblatt did not make any such threats.  Both Meister and Mandelblatt testified that they did not threaten a consent solicitation.[99]  This is consistent with testimony from other Williams directors, who generally testified that they did not perceive or recall perceiving threats from Meister and Mandelblatt.[100]  Although one director, Kathleen Cooper, testified equivocally during a 2016 deposition that she thought she recalled Meister stating that he and Mandelblatt would initiate a consent solicitation if a deal was not reached,[101] her uncertain testimony is outweighed by the testimony of the other Williams directors. In any event, she acknowledged that to the extent there was such a threat, it did not "affect[] [her] feelings about the deal."[102]

The other evidence presented by ETE does not support their argument that purported threats from Meister and Mandelblatt were a significant factor in the Williams' Board's decision to approve the Merger.  Cooper's October 22, 2015 email to Stoney lamenting that "we succumbed to the threats just at the wrong time rather than fighting for long-term shareholder value at [Williams]" referred to threats

---

[98] Defs.' and Countercl. Pl.'s Post-Trial Br., Dkt. No. 637 at 9–11 [hereinafter "ETE OB"].
[99] Meister Dep. at 402:25–403:13; Mandelblatt Dep. at 377:19–25.
[100] Trial Tr. at 856:18–21(Stoney); *id.* at 859:17–860:12(Stoney); Hinshaw Dep. at 276:9–14; Sugg Dep. at 314:11–18 (2018); Nance Dep. at 62:19–63:10; Izzo Dep. at 107:18–24; Smith Dep. at 167:9–169:15 (2018).  ETE did not depose Cleveland, whose deposition was cancelled for medical reasons in 2019.  ETE OB at 10 n.20.
[101] Cooper Dep. at 31:11–33:25 (2016).
[102] *Id.* at 32:21–23.

from when Meister and Mandelblatt joined the Board in early 2014, not threats in connection with the Merger.[103] Likewise, Armstrong's notes to himself regarding "[t]hreatening Proxy contests" and "[t]hreatening personal liability in case of proxy fight"[104] referred to these perceived 2014 threats and his general thoughts about the presence of activists in the Williams boardroom.[105] Finally, while the September 24-25, 2015 Williams Board meeting minutes do discuss "appreciation of the practical consequences of a rejection of the" Merger, including "the likelihood of a consent solicitation to replace all or certain Directors" and the "expected response of Messrs. Mandelblatt and Meister,"[106] the minutes make no mention of "threats" from Mandelblatt and Meister. This is consistent with Stoney's testimony, during which she stated that the Board discussed the likelihood of a consent solicitation being launched and the likelihood of the outcome, but that no one had threatened a consent solicitation.[107] Williams disclosed to stockholders in the Form S-4 registration statement (the "S-4") filed with the Securities Exchange Commission (the "SEC") that the Williams Board discussed a potential consent solicitation when evaluating the Merger.[108]

---

[103] JTX-0235.0001; JTX-0012.
[104] JTX-0223.0003.
[105] Trial Tr. at 713:24–714:21(Armstrong); *id.* at 706:9–707:4(Armstrong).
[106] JTX-0137.0004.
[107] Trial Tr. at 854:7–856:21(Stoney).
[108] JTX-1218.0148.

On September 28, 2015, the Williams Board approved and declared advisable the Merger.[109] As a result, Williams terminated the WPZ agreement and paid the $410 million termination fee to WPZ.[110] Under the Merger Agreement, if the Merger failed and certain conditions were met, ETE was required to reimburse Williams for the $410 million termination fee (the "WPZ Termination Fee Reimbursement").[111]

### 5. The Energy Market Deteriorates

In late 2015, commodity prices declined sharply, leading to a deterioration of the energy market.[112] As a result, both Williams and ETE reassessed the Merger in light of their changing financial positions.

ETE was concerned about its ability to finance the Merger. Warren was concerned that the $6.05 billion cash component of the Merger consideration was a "problem"[113] because the debt required to finance it could lead to a "potential ratings downgrade" to "junk status."[114] The ETE senior management team was likewise concerned about the cash component of the Merger consideration.[115]

In light of these concerns about financing the cash consideration, by January 2016, Warren no longer wanted to close the Merger as it was structured.[116] On

---

[109] Stip. ¶ 33.
[110] Trial Tr. at 13:15–14:12(Chappel); JTX-0202.0004.
[111] JTX-0209.0059 (§5.06(f)).
[112] Trial Tr. at 33:21–34:3(Chappel).
[113] *Id.* at 308:16–22(Warren).
[114] *Id.* at 325:14–21(Warren).
[115] *Id.* at 330:20–331:1(Warren).
[116] *Id.* at 296:3–18(Warren).

January 7, 2016, Warren called a meeting of ETE executives and lawyers to discuss ETE's "rights and obligations under the merger agreement" because, "as structured," Warren believed the Merger "was not in ETE's best interests."[117] At the meeting, Warren expressed that he believed that the Merger, as structured with a cash consideration component, "would create a ratings downgrade" that would lead to an "implosion."[118] Warren indicated that he was "very much opposed to the" Merger and would "walk away" "[i]f he could, under the merger agreement."[119]

Four days later, on January 11, 2016, Warren spoke over the phone with Frank MacInnis, the Williams Chairman.[120] On the call, Warren proposed a meeting to discuss a "restructuring" or "changes" to the Merger Agreement.[121] Warren stated that ETE also would not be able to restructure the deal to be "all-equity."[122] The Williams Board minutes describing MacInnis's summary of the call state that Warren "discussed the possibility of terminating the transaction and had mentioned the possibility of cutting distributions."[123] At trial, Warren acknowledged it was possible that he told MacInnis that ETE might have to cut distributions if the Merger closed as structured.[124] The following day, on January 12, 2016, Armstrong and

[117] JTX-0331; Trial Tr. at 422:2–13(Welch).
[118] Trial Tr. at 422:21–423:5(Welch).
[119] *Id.* at 423:23–424:14(Welch).
[120] JTX-0357.0005.
[121] *Id.*
[122] JTX-0378.0002; Trial Tr. at 334:13–17(Warren).
[123] JTX-0378.0002; Trial Tr. at 333:18–334:17(Warren); *id.* at 207:7–14(Van Ngo).
[124] Trial Tr. at 333:18–334:7(Warren).

Chappel met with Tom Long, the then-CFO of an ETE subsidiary, who proposed changes to the terms of the deal.[125]

Two days later, on January 14, 2016, Chappel and Williams' financial advisor from Lazard, Al Garner, met with Warren and Welch.[126] At this meeting, Warren and Welch expressed that the Merger was now "a problem."[127] In a contemporaneous email describing the discussion, a Lazard employee wrote that Warren and Welch stated that "ETE may be forced to cut distribution[s] to zero for 2 years."[128] Likewise, both Chappel and Garner testified at trial that at this meeting, Warren and Welch stated "that they would have to cut distributions to zero for two years."[129] Although Warren and Welch indicated that they "plan[ned] to 'honor [the] agreement,'" they stated that if Williams were to "walk, ETE would not require [a] breakup fee" and they "also offered to 'help' purchase WPZ assets if [the] deal [is] called off."[130] Welch also stated that he believed the S-4 needed to disclose that Williams would be worth more as a standalone company than with "ETE with no distr[ibutions]."[131]

---

[125] *Id.* at 34:15–35:23(Chappel).
[126] *Id.* at 35:24–36:8(Chappel); *id.* at 150:4–7(Garner); JTX-0374.0001.
[127] JTX-0374.0001.
[128] *Id.*
[129] Trial Tr. at 36:9–23(Chappel); *id.* at 150:8–24(Garner); JTX-0327.0001.
[130] JTX-0374.0001.
[131] *Id.*

For its part, the Williams Board and management also had some internal dissent with respect to the merits of the Merger. As I discussed above, the Williams Board had approved the Merger in an 8-to-5 vote.[132] This internal dissent continued during the market collapse. In December 2015, the Williams Board called a meeting to discuss the "dire" "state of the markets."[133] Armstrong wanted to terminate the Merger, and he was a "strong voice" in that discussion.[134]

Armstrong encouraged Williams' CFO, Chappel, to "accept forecast assumptions for Williams" and "pessimistic forecast assumptions for ETE," though Chappel, who supported the Merger, had "strong support from the [B]oard to ensure that the forecasts were thoughtfully prepared, well-vetted, and balanced between optimism and pessimism and provided transparency to the [B]oard."[135] Armstrong did, however, present optimistic projections of Williams as a standalone company to the Board in February 2016 without vetting them with Chappel.[136] Armstrong and other dissenting directors also included Stoney and Cleveland on emails expressing their disagreement regarding the merits of the Merger, including their

---

[132] JTX-0137.0006.
[133] JTX-0308.0001–.0002.
[134] Trial Tr. at 120:7–23(Chappel).
[135] *Id.* at 121:13–22(Chappel).
[136] *Id.* at 124:10–125:2(Chappel).

criticism of Williams' banker's financial analysis.[137]   Stoney testified that she nonetheless never felt pressure to reconsider her position.[138]

Despite the internal dissent at Williams, the Williams Board determined at a January 15, 2016 meeting that the Merger Agreement was a "valuable asset" and resolved to issue a press release expressing its unanimous support for the Merger.[139] The Williams Board issued that press release the same day, stating that it was "unanimously committed to completing the transaction."[140]  Williams also asked its financial advisors, Lazard and Barclays, to assess the value of the Merger to Williams stockholders in light of the changing market conditions,[141] and to assess to value of a potential breakup fee from ETE.[142]  Both concluded that the Merger still provided Williams stockholders with billions of dollars in value.[143]

In response to ETE's concerns about financing the cash component of the consideration, Williams proposed restructuring the Merger by swapping the cash component for equity at the then-current market value of ETE units.[144]  ETE refused

---

[137] *See* JTX-0437; JTX-0439; JTX-0755; JTX-1019; Tr.127:8–16(Chappel); JTX-0727; JTX-0743.

[138] Trial Tr. at 865:5–866:7(Stoney).  As I noted above, Cleveland did not testify at trial or deposition, after his deposition was cancelled for medical reasons in 2019.  ETE OB at 10 n.20.

[139] JTX-0378.0002.

[140] JTX-0379.0001.

[141] JTX-0441; JTX-0449; Trial Tr. at 38:3–39:18(Chappel); *id.* at 157:6–158:2(Garner).

[142] JTX-0742; JTX-0741; Trial Tr. at 888:3–889:6(Stoney).

[143] JTX-0441.0006, .0025; JTX-0449.0085; Trial Tr. at 38:3–39:18(Chappel); *id.* at 159:1–160:16(Garner).

[144] JTX-0382.

and countered with an offer to replace the cash consideration with ETE units at a valuation from before the energy market decline.[145]

a. ETE Crafts a Public Offering with a Distribution Preference

To solve its leverage issues, ETE structured two equity issuances—a public offering, which Williams rejected (the "Proposed Public Offering"); and a private offering, which ETE completed without Williams' consent (the "Preferred Offering"). The Preferred Offering ultimately became the subject of an action brought by ETE unitholders, in which I found that ETE breached its partnership agreement in connection with the offering (the "*Unitholder* action").[146]

Shortly after ETE raised the possibility of distribution cuts to Williams in January 2016, ETE retained Perella Weinberg Partners ("Perella") to advise ETE on solutions to its potential leverage issues.[147] One of the solutions Perella presented was the Proposed Public Offering.[148] Perella and ETE explored other options too, such as selling assets and issuing common units, but concluded that those were not viable.[149] Perella and ETE also raised the possibility of cutting distributions,[150]

---

[145] JTX-0382; Trial Tr. at 310:24–312:1(Warren).
[146] *In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706, at \*22–25 (Del. Ch. May 17, 2018), *aff'd sub nom. Levine v. Energy Transfer L.P.*, 223 A.3d 97 (Del. 2019).
[147] Trial Tr. at 152:8–153:16(Garner); JTX-0382.0001; Trial Tr. at 435:13–19(McReynolds); *id.* at 458:4–459:19(McReynolds).
[148] JTX-0330.0033; JTX-0426.0034; Trial Tr. at 340:9–343:2(Warren).
[149] Trial Tr. at 436:19–437:14(McReynolds); *id.* at 438:19–439:13(McReynolds); *id.* at 1654:21–1656:18(Bednar); Long Dep. at 96:9–19 (2019); Trial Tr. at 384:12–385:10(Warren).
[150] Trial Tr. at 339:1–340:3(Warren); *id.* at 1662:18–21(Bednar); JTX-0400.0001.

though they deemed that "an option of last resort" due to the potential negative "longer-term implications" of cutting distributions, including on ETE's credit rating.[151] However, ETE received positive responses from its credit rating agencies when it previewed to them the Proposed Public Offering.[152] As originally conceived, participants would forgo distributions on their common units for a set period.[153] In exchange for forgoing such distributions, participants would receive preferred units that paid discretionary distributions of up to 40% of the distributions paid on common units.[154] At the end of the period, the distributions on participants' common units would become unrestricted, and the participants' preferred units would convert into additional common units, calculated based on the amount of distributions that participants forwent.[155]

Perella first presented the Proposed Public Offering to ETE at a meeting with Warren on January 27, 2016.[156] As originally proposed, the offering did not feature any distribution preference for participants.[157] Warren testified at trial that, at the time, ETE had considered the possibility of a two-year distribution cut, even though

---

[151] Trial Tr. at 1648:22–1652:8(Bednar); *id.* at 438:3–18(McReynolds); *id.* at 1565:3–17(Bramhall); *id.* at 301:14–23(Warren); McGovern Dep. at 32:24–34:9 (2018); JTX-0598.0016; Long Dep. at 65:23–67:3 (2016); JTX-0399.0006.
[152] JTX-0679.0002.
[153] JTX-0330.0033.
[154] *Id.*
[155] *Id.*
[156] *Id.*; JTX-0426.0034; Trial Tr. at 340:9–343:2(Warren).
[157] JTX-0330.0033; JTX-0426.0034; Trial Tr. at 340:9–343:2(Warren).

distribution cuts are "the last bucket you go to."[158] As the holder of over 190 million ETE units, however, Warren would lose over $200 million per year in personal cash flow if ETE eliminated distributions.[159] Warren therefore proposed that Perella add a distribution preference for participants in the offering.[160] In response, ETE's advisors revised the offering to feature an 11 cent per quarter distribution preference,[161] a reduction from ETE's historic distribution of 28½ cents per quarter.[162]

Despite Warren's support for a distribution preference, ETE's CFO, Welch, expressed reservations.[163] Welch expressed to Warren and other ETE executives that he believed there was no justification for a distribution preference, and that a distribution preference would create "a superpriority class of holders versus all other common holders."[164] Welch believed that Warren was "looking to . . . ensure that there was a certain amount of cash, annual cash flow, that he would receive with certainty to, basically, support his living" if ETE cut distributions.[165] Warren insisted, however, that "there needed to be a minimum level of certainty on cash

---

[158] Trial Tr. at 339:1–340:8(Warren); *id.* at 347:9–348:4(Warren); *see also id.* at 426:4–429:19(Welch).

[159] Trial Tr. at 334:18–335:24(Warren); *id.* at 388:6–389:24(Welch).

[160] JTX-0434.0001; Trial Tr. at 464:24–466:6(McReynolds); *id.* at 399:3–401:24(Welch).

[161] JTX-0434.0001; JTX-0457.0008; Trial Tr. at 464:24–466:6(McReynolds); *id.* at 1668:4–1671:5(Bednar).

[162] JTX-0430.0001.

[163] Trial Tr. at 399:3–401:24(Welch).

[164] *Id.* at 390:22–393:3(Welch); *id.* at 398:21–400:10(Welch); *id.* at 401:4–24(Welch).

[165] *Id.* at 402:1–14(Welch); *id.* at 428:14–429:19(Welch).

flow on a going-forward basis, if he was to support" an offering.[166] Warren asserted that "the preferred payment was a necessary core part of [the] program . . . which was needed for him to support it."[167]

On February 8, 2016, Perella presented a revised proposal to the ETE Board.[168] This time, the proposal featured the 11-cent cash distribution preference, which would be paid regardless of whether ETE cut distributions on common units.[169] One ETE director, John McReynolds, questioned whether the offering would "really save up to $1B[illion] if distributions actually later get cut."[170] At trial, he acknowledged that if distributions were cut to zero, the offering would not save ETE any money during that period.[171]

In its February 8 presentation, Perella also posed distribution cuts as a potential alternative that would have "[n]o execution risk" and would "[s]atisf[y] rating agencies."[172] ETE sought additional advice from a second financial advisor, Goldman Sachs & Co. ("Goldman Sachs"), who gave a February 12, 2016 presentation suggesting a "[s]ubstantial distribution / dividend cut" if the Merger closed, among other alternatives.[173] Goldman Sachs advised that a distribution cut

---

[166] *Id.* at 389:5–24(Welch).
[167] *Id.* at 390:22–391:12(Welch).
[168] JTX-0482.0002–.0016; Trial Tr. at 343:3–10(Warren).
[169] JTX-0482.0008, .0012; Trial Tr. at 343:3–345:10(Warren).
[170] JTX-0465.0003.
[171] *Id.*; Trial Tr. at 468:13–17(McReynolds).
[172] JTX-0486.0004–.0005.
[173] JTX-0506.0003.

was "likely to be well received by [the] market given current trading levels and investor concerns."[174]  In February 2016, ETE also ran models evaluating distribution cuts.[175]

ETE sent the terms of the Proposed Public Offering to Williams on February 12, 2016.[176]  ETE was not able to complete the offering unless Williams instructed its independent registered accounting firm to provide consent to the incorporation by reference of the firm's report on Williams' audited financial statements.[177]  ETE therefore requested Williams' auditor's consent to file with the SEC.[178]  The next day, on February 13, 2016, Williams responded that it believed the Proposed Public Offering would violate the Merger Agreement and that the Board was required to assess it.[179]  Chappel also noted that Williams "reviewed potential additional actions that we could take to strengthen the WPZ and [Williams] credit profile."[180]

In the meantime, the ETE Board met again on February 15, 2016, and discussed the Proposed Public Offering.[181]  At this meeting, the ETE Board revised

---

[174] *Id.*
[175] JTX-0461.0002; JTX-0475.0002; JTX-0579; JTX-0500.0001; Trial Tr. at 1579:7–1583:15(Bramhall).
[176] JTX-0507; Trial Tr. at 52:6–13(Chappel).
[177] Stip. ¶ 25.
[178] Trial Tr. at 52:14–20(Chappel).
[179] JTX-0517.0001; Trial Tr. at 208:11–20(Van Ngo); *id.* at 53:10–22(Chappel); JTX-0537.0002.
[180] JTX-0517.0001.
[181] JTX-0535; JTX-0536.0001–.0002.

the distribution preference to include an additional 17½ cents of accrual credits, toward new units, per quarter, in addition to the 11-cent cash distribution.[182]  This had the effect of preserving ETE's historic distribution of 28½ cents for Proposed Public Offering participants, and therefore eliminated the risk of a distribution cut for those participants.  Although ETE asserts that it added the accrual credits to ensure that the Proposed Public Offering would be marketable,[183] the elimination of downside risk was an advantage to ETE insiders, including Warren and ETE senior management, who had pledged to "commit their units to th[e] program."[184]

ETE made this change itself before consulting Perella.[185]  After ETE informed Perella of the change, a Perella analyst remarked that "[i]f cash distributions on common units are cut to zero, the preferred [payment in kind ("PIK")] distributions don't conserve cash in and of themselves—rather, they represent a wealth transfer from non-participating to participating units."[186]

### b. Williams Declines to Consent to the Proposed Public Offering

The Williams Board asked its financial advisors, Lazard and Barclays, to assess the Proposed Public Offering.[187]  On February 17, 2016, both advisors

---

[182] JTX-0535.0019; JTX-0538.0002; Trial Tr. at 351:1–352:10(Warren).

[183] ETE OB at 26–27; Trial Tr. at 1656:19–1658:3(Bednar); *id.* at 441:17–442:11(McReynolds); *id.* at 450:3–21(McReynolds).

[184] JTX-0518.0001; JTX-0512.0001.

[185] Trial Tr. at 1677:2–19(Bednar); JTX-0532.0001.

[186] JTX-0537.0001.

[187] Trial Tr. at 53:10–55:1(Chappel).

recommended that the Williams Board decline to consent.[188] Although Williams believed that the Proposed Public Offering would have a positive impact on ETE's leverage issues,[189] the advisors determined that because the Proposed Public Offering would allow participants to benefit disproportionately over nonparticipating unitholders (including future ETC stockholders) in the event of a distribution cut, it "would have an extraordinary detrimental impact on Williams shareholders."[190] Chappel agreed with this analysis.[191] The Williams Board therefore declined to provide consent.[192]

On February 18, 2016, Williams informed ETE that it would not provide consent.[193] Although ETE contends that it was surprised by this news,[194] ETE's CFO admitted in the *Unitholder* action that Chappel had already informed him on February 13, 2016 that "he was not going to allow [Williams Co.'s] auditors to provide the consent."[195] The next day, Chappel and Williams' general counsel met with Welch and ETE's general counsel, and Chappel stated that Williams was open to other solutions, "including an offering that Williams shareholders could participate in on an equivalent basis to ETE shareholders, one that would treat

[188] *Id.* at 54:5–22(Chappel).
[189] *Id.* at 113:5–16(Chappel).
[190] *Id.* at 54:9–22(Chappel); *id.* at 162:22–168:23(Garner); JTX-0551.0008, .0010.
[191] Trial Tr. at 54:23–55:1(Chappel).
[192] Stip. ¶ 25. JTX-0549.0003.
[193] Trial Tr. at 54:5–55:16(Chappel); JTX-0561.0002.
[194] ETE OB at 27.
[195] *Energy Transfer*, 2018 WL 2254706, at *6.

Williams shareholders fairly and so they would be in the same class as ETE shareholders."[196]

ETE refused this proposal.[197] Instead, ETE devised the private Preferred Offering, featuring a similar distribution preference, which I found in the *Unitholder* action was "a hedge meant to protect insiders from the anticipated bad effects of the coming merger."[198]

### c. ETE Makes the Private Preferred Offering

Unlike the Proposed Public Offering, the private Preferred Offering did not require the consent of Williams' auditors.[199] On February 25, 2016, a few days before the ETE Board approved the Preferred Offering, Warren was asked on earnings call about potential distribution cuts at ETE and an ETE affiliate, ETP.[200] Warren stated that there were "no contemplated distribution cuts at ETP whatsoever."[201] With respect to ETE, however, Warren stated that although "ETE is very healthy" and "distribution cuts are not required," "everybody knows obviously that that's an option."[202] Warren added that "[i]t would be one of the last [buckets] that we would reach to, but it's certainly possible."[203]

---

[196] JTX-0561; Trial Tr. at 56:1–57:7(Chappel).
[197] Trial Tr. at 57:8–14(Chappel).
[198] *Energy Transfer*, 2018 WL 2254706, at *1.
[199] *Id.* at *8.
[200] JTX-0595.0013; Trial Tr. at 355:9–357:8(Warren).
[201] JTX-0595.0013.
[202] *Id.*
[203] *Id.*

35

The next day, on February 26, 2016, Warren called an ETE Board meeting to discuss the Preferred Offering.[204] The ETE Board met on February 28, 2016 and approved the Preferred Offering,[205] in a process which I found in the *Unitholder* action breached ETE's limited partnership agreement because it involved, among other things, a "fatally flawed" conflicts committee and "untrue" board resolutions.[206] ETE instructed its counsel not to inform Williams of the Preferred Offering until after it closed.[207]

ETE closed the Preferred Offering on March 8, 2016.[208] The Preferred Offering created a new class of equity—Series A Convertible Preferred Units[209]—which featured an increased distribution preference of 28½ cents.[210] 17½ cents of this was to be an accrual credit toward PIK distributions, saving ETE cash if common unit cash distributions continued without diminution.[211] Unlike the Proposed Public Offering, the Preferred Offering was made available only to ETE insiders.[212] Warren, McReynolds, and Ray Davis, ETE's co-founder, received over 85% of the

---

[204] JTX-0606.
[205] *Id.* at .0002; JTX-0638; Trial Tr. at 357:9–360:2(Warren).
[206] *Energy Transfer*, 2018 WL 2254706, at *12, 20, 24–25.
[207] Trial Tr. at 209:2–15(Van Ngo); Katz Dep. at 64:4–65:10; McReynolds Dep. at 191:11–192:17 (2019).
[208] Stip. ¶ 26.
[209] *Id.*
[210] JTX-0713.0008; Trial Tr. at 169:9–172:3(Garner); *id.* at 490:13–492:11(Ruback).
[211] JTX-1218.0045–.0046.
[212] Trial Tr. at 169:9–170:10(Garner); JTX-0713.0008.

total preferred units.[213] Those to whom the Preferred Offering was extended were invited to participate pro rata based on their holdings of existing units.[214] Warren and McReynolds participated in the Preferred Offering with respect to substantially all of their units.[215]

The market's reaction to the Preferred Offering was mixed. One ETE investor suggested that the Preferred Offering could be a "sub-rosa plan to give management the ability to preserve payments to itself while shutting off distributions to common unit-holders entirely," which "would not be consistent with [ETE's] well-earned reputation."[216] An analyst wrote to McReynolds that "it looks to me (and the market, apparently) that [Warren] has insulated himself from a distribution cut, but ETE common holders are still on the hook for a potential distribution cut should one be required."[217]

Williams and its stockholders were also concerned. One Williams stockholder admonished that "[t]he insiders at ETE are enriching themselves at the expense of the rest of the ETE shareholders" and decried the Preferred Offering as "something similar" to a "fraudulent conveyance."[218] Garner testified that he

---

[213] Trial Tr. at 1648:16–1750:18(Atkins).
[214] JTX-1218.0045.
[215] Trial Tr. at 1748:16–19(Atkins); *id.* at 449:2–450:10(McReynolds); JTX-1218.0046.
[216] JTX-0702.0001.
[217] JTX-0705.0001. Trial Tr. at 474:9–24(McReynolds).
[218] JTX-0711.0001–.0002; Trial Tr. at 475:1–17(McReynolds).

believed the Preferred Offering was "more outrageous than the prior one,"[219] and Chappel testified that he believed it "was a complete game changer with respect to what was bargained for in the merger agreement."[220] Likewise, Stoney described the Preferred Offering "as a sweetheart deal" for "the CEO of ETE and some small selected group of people."[221]

Meanwhile, ETE's credit ratings agencies responded positively to the Preferred Offering.[222] Indeed, Fitch, one of the three major rating agencies, described the Preferred Offering as "a proactive step in enhancing [ETE's] liquidity and managing acquisition leverage in a credit neutral manner."[223]

### d. ETE Announces Plans to Cut Distributions

In February and April 2016, Williams provided ETE with financial projections.[224] The February 10, 2016 projections, which were ratings agency updates, included both base-case and downside case forecasts.[225] Dylan Bramhall, ETE's Vice President of Financial Planning and Analysis,[226] testified at trial that these forecasts indicated to ETE that Williams had "bottomed out" from late 2015 declines, "the numbers had stepped back up a little bit," and ETE "felt that business

---

[219] Trial Tr. at 169:16–18(Garner).
[220] *Id.* at 58:21–59:10(Chappel).
[221] *Id.* at 866:17–867:5(Stoney).
[222] JTX-0716.
[223] *Id.* at .0001; *Energy Transfer*, 2018 WL 2254706, at *14.
[224] JTX-0495.
[225] *Id.* at .0010, .0022.
[226] Trial Tr. at 1564:17–20(Bramhall).

was performing well enough to cover current distribution levels."[227]   Bramhall testified that ETE understood the base-case projections to reflect Williams' view "as [to] what was most expected."[228]

In late March and early April 2016, ETE asked Williams to provide updated projections to incorporate in an amendment to the S-4.[229]   Williams sent updated projections to ETE on April 7, 2016.[230]   Williams' April 7 projections were bleaker than its projections from February 10.  Compared to the February 10 base-case forecast, Williams' April 7 forecast projected lower distributable cash flows for WPZ—by 15.8% in 2016 and 21.7% in 2017.[231]   But when compared against the February 10 downside forecast, the April 7 projections for WPZ's distributable cash flows were lower by just 5.9% in 2016 and 11.3% in 2017.[232]

When Chappel sent the projections to ETE, he presented them as "based on the Downside Case that we presented . . . in February."[233]   However, Long asked Chappel on April 15, 2016 whether the updated projections "represent [Williams'] most realistic projections," or whether there were additional "adjustments that should be made to the projections to reflect [Williams'] most realistic

---

[227] *Id.* at 1571:6–1572:5(Bramhall).
[228] *Id.* at 1632:16–1633:3(Bramhall).
[229] *Id.* at 1572:6–20; JTX-0807.
[230] JTX-0846.
[231] Plaintiff's Demonstrative Ex. 5 at 3.
[232] *Id.* at 4.
[233] JTX-0846.0001.

projections."[234] Chappel replied that Williams viewed the April 7 projections "as appropriately capturing a discount for customer credit risk, a realistic risk in this environment," and that he "d[id] not believe that additional adjustments [were] necessary."[235] Bramhall testified that the projections in the April 7 update were a "surprise" that "caught everyone off guard" and demonstrated to ETE that "it was going to be difficult for WPZ to maintain [its] current distribution levels and keep leverage below five times."[236] But he also acknowledged that by this point, ETE had already been "looking at what would happen on the [Williams] downside case as well."[237]

In addition to Williams' declining projections, ETE also revised its synergies estimates downward between February and April 2016. On February 23, 2016, ETE estimated Merger synergies between $195–$879 million annually.[238] ETE increased its synergies estimate to between $403–889 million on March 9, 2016,[239] but on April 15, 2016, it reduced its base-case estimate to $126 million.[240]

On April 18, 2016, six weeks after closing the Preferred Offering, ETE announced publicly in an amendment to the S-4 that if the Merger closed, it expected

---

[234] JTX-0963.0001.
[235] *Id.*
[236] Trial Tr. at 1572:6–1575:6(Bramhall).
[237] *Id.*
[238] JTX-0581.0003.
[239] JTX-0686.0004.
[240] JTX-0957.0002.

to eliminate common unit distributions for two years.[241] ETE restated this expectation in the amended S-4 filed on May 24, 2016.[242]

The parties dispute what precipitated this announcement. Williams contends that ETE had anticipated a potential distribution cut since January 2016, shortly after the energy market began to crater.[243] In contrast, ETE asserts that it only decided to cut distributions in April 2016, after a confluence of the bleaker financial projections from Williams on April 7, 2016 and the decreased synergies estimates in April 2016.[244]

The evidence presented at trial demonstrated that ETE anticipated the potential distribution cuts as early as January 2016. As I noted above, Warren and Welch both raised the possibility of distribution cuts in January 2016, including specifically a two-year distribution cut mirrored by the anticipated cut that ETE ultimately announced.[245] Warren also testified that when Perella first presented the Proposed Public Offering in late January 2016, ETE had been considering the possibility of a two-year distribution cut.[246] In February 2016, both of ETE's advisors, Goldman Sachs and Perella, suggested distribution cuts as possible

---

[241] JTX-0992.0046; Trial Tr. at 362:17–364:1(Warren).
[242] JTX-1218.0046; Trial Tr. at 483:3–11(McReynolds).
[243] Pl.'s and Countercl. Def.'s Posttrial Br., Dkt. No. 630 at 37–43 [hereinafter "Williams OB"].
[244] ETE OB § II.D.4.
[245] *See supra* notes 123–24, 128–29 and accompanying text.
[246] *See supra* note 158 and accompanying text.

alternatives,[247] and ETE ran models involving distribution cuts.[248] On the February 25, 2016 earnings call, Warren definitively ruled out a distribution cut at ETP, but equivocated regarding an ETE distribution cut.[249]

ETE's evidence that it only began to expect post-closing distribution cuts in April 2016 is unconvincing. When Long testified at the *Unitholder* trial that ETE only expected a distribution cut after it received Williams' April 7 projections, he asserted that the new projections showed a "huge" "50 percent" drop in distributable cash flow.[250] That was incorrect: As discussed above, even when compared to the more positive February 10 base-case projections instead of the downside case projections, the drop was actually 15.8% in 2016 and 21.7% in 2017.[251] When deposed in this matter, Long acknowledged that the drop "wasn't nearly as large" as what he had previously testified.[252] Bramhall also admitted at trial that what Long characterized "as a 50 percent decrease . . . was, in fact, a 21 percent decrease."[253]

Moreover, although Bramhall testified on direct examination that ETE did not begin to expect distribution cuts until early April 2016 and that before then, "executives at Energy Transfer were very opposed to distribution cuts,"[254] he

---

[247] *See supra* notes 172–74 and accompanying text.
[248] *See supra* note 175 and accompanying text.
[249] *See supra* notes 200–03 and accompanying text.
[250] JTX-1387.0274:16–.0275:4 (Long *Unitholder* testimony).
[251] *See supra* note 231 and accompanying text.
[252] Long Dep. at 164:23–165:12 (2019).
[253] *Id.* at 1594:6–20(Bramhall).
[254] *Id.* at 1565:3–12(Bramhall); *id.* at 1567:5–12(Bramhall).

admitted on cross-examination that distribution cuts were "above [his] pay grade" and he "did not know what the executive team was discussing."[255]  Bramhall also conceded at trial that, even before receiving Williams' April 7 projections, ETE had already incorporated Williams' February 10 downside projections—which more closely approximated the April 7 projections—into its S-4 projections.[256]

As of the Closing Date, ETE continued to state that it expected to cut distributions on common units, including common units held by former Williams stockholders, to zero until March 31, 2018.[257]  Meanwhile, ETE expected that participants in the Preferred Offering would receive 28½ cents in value per quarter during the same period—including up to 11 cents in cash,[258] which would amount to over $150 million in cash flow for Warren personally.[259]

### 6. Williams Defends Stockholder Actions

Between signing and closing, Williams faced multiple stockholder actions challenging the Merger.  Williams managed to prevent each of them from blocking the Merger by obtaining either a dismissal or settlement.[260]

---

[255] *Id.* at 1576:4–1578:19(Bramhall).
[256] *Id.* at 1572:6–20(Bramhall).
[257] *See* JTX-1218.0046.
[258] *Id.* at .0045–.0046, .0054.
[259] Trial Tr. at 371:20–373:1(Warren); JTX-1218.0046.
[260] *In re The Williams Cos., Inc. Merger Litig.*, No. 11844-VCG (Del. Ch. dismissed July 19, 2017); *In re The Williams Cos., Inc. Stockholder Litig.*, No. 11236-VCG (De. Ch. dismissed Mar. 31, 2016); *City of Birmingham Retirement & Relief Sys. v. Armstrong*, No. 16-17-RGA, Dkt. No. 59, (D. Del. dismissed Mar. 7, 2016); *Bumgarner v. Williams Cos., Inc.*, 2016 WL 1717206 (N.D. Okla. Apr. 28, 2016).

43

One of those lawsuits, brought by Williams stockholder and former executive John Bumgarner,[261] was at issue in this litigation. ETE contends that Armstrong, who was "tasked with executing the Board's directive to close the transaction,"[262] flouted this directive by working covertly with Bumgarner to support his lawsuit and put a stop to the Merger.[263] But the evidence presented at trial demonstrated that, although Armstrong did regularly communicate with Bumgarner, he did so in an attempt to allay Bumgarner's opposition to the Merger, not in connection with a clandestine plot to thwart it.[264]

Bumgarner had worked at Williams for approximately 25 years, retiring around 2001.[265] At one time, Bumgarner was in charge of mergers and acquisitions at Williams and he was an advisor to the then-CEO.[266] After the Merger was announced, Bumgarner approached Armstrong and threatened litigation regarding the synergies estimates contained in joint press release announcing the Merger.[267] In particular, Bumgarner took issue with a $2 billion estimate made by ETE that was

[261] *See generally Bumgarner*, 2016 WL 1717206.
[262] Trial Tr. at 657:2–7(Armstrong).
[263] ETE OB § II.B.1.
[264] This is not to say that Armstrong's tactics in attempting to assuage Bumgarner's concerns represented a model of corporate governance best practices.
[265] Trial Tr. at 903:6–904:11(Bumgarner); *id.* at 620:6–23(Armstrong).
[266] *Id.* at 903:11–904:11(Bumgarner); *id.* at 620:6–23(Armstrong).
[267] *Id.* at 625:3–626:19(Armstrong); *id.* at 699:6–700:3(Armstrong); *id.* at 719:22–720:3(Armstrong).

referenced in the press release.[268]  As former colleagues, Armstrong and Bumgarner were friends.[269]  Armstrong testified that, leveraging this relationship, he tried to explain to Bumgarner that the $2 billion estimate came from ETE, and that the Williams Board relied on its own synergies estimate of $200 million, which would be disclosed in the S-4.[270]

Armstrong did not notify Williams' counsel of Bumgarner's threats, though he did inform the Chairman of Williams' Board, Frank MacInnis.[271]  At trial, Armstrong testified that he did not notify Williams' counsel because he thought that it would lead to a counterproductive "very aggressive fight," and he believed he could "keep [Bumgarner] . . . at bay" in light of their personal and professional relationship.[272]  Armstrong also testified that he believed that when the S-4 was filed, it would "satisfy [Bumgarner's] concerns."[273]  This is consistent with contemporaneous emails:  On January 11, 2016, Bumgarner emailed MacInnis and Armstrong, challenging the S-4, and wrote, "I briefly jumped Alan about this matter and got the 'My hands are tied; I have to support the deal.' response."[274]  Armstrong

[268] *Id.* at 623:20–626:19(Armstrong); *id.* at 921:8–15(Bumgarner).  Bumgarner's concerns were ultimately validated; as I discussed above, ETE and Williams later revised their synergies estimate downward to $126 million.  JTX-0957.0002.

[269] Trial Tr. at 620:6–13(Armstrong); *id.* at 908:18–910:10(Bumgarner).

[270] *Id.* at 624:6–24(Armstrong); *id.* at 919:15–19(Bumgarner).

[271] *Id.* at 637:12–638:17(Armstrong).

[272] *Id.* at 637:19–638:17(Armstrong).

[273] *Id.* at 638:6–13(Armstrong).

[274] JTX-0356.0002.

forwarded the thread to MacInnis and asked, "[d]o you think we should call him? Or just let this run its course."[275]

From November 2015 through July 2016, Armstrong and Bumgarner met approximately weekly.[276] Much of their communication occurred either in person or via Armstrong's personal email accounts; Armstrong testified that he was "pretty careful to have most of [his] conversation[s] with [Bumgarner] in person."[277] The bulk of the email communication between Armstrong and Bumgarner during this time involved two of Armstrong's personal email addresses at Gmail.com and Cox.net.[278] In 2016, two days after being asked at a deposition whether he emailed Bumgarner, Armstrong deleted his Gmail account, though he did not delete his Cox.net account.[279] At trial, Armstrong testified that he deleted the Gmail account because it had been corrupted and was sending unsolicited spam messages to his contacts, including Chappel.[280] As discussed below, I find this testimony unconvincing.[281]

Although Armstrong deleted his Gmail account, ETE was able to uncover much of his email communication by subpoenaing Bumgarner's accounts.[282] On

---

[275] *Id.* at .0001.
[276] Trial Tr. at 621:7–13(Armstrong); *id.* at 910:12–14(Bumgarner).
[277] *Id.* at 623:2–12(Armstrong).
[278] Defendants' Demonstrative Ex. 3.
[279] JTX-1437.0008–.0009; Trial Tr. at 632:1–18(Armstrong).
[280] Trial Tr. at 632:5–18(Armstrong).
[281] *See infra* § II.E.
[282] JTX-1394.

December 6, 2015, Bumgarner emailed Armstrong and requested Armstrong's "edits and corrections" to a document compiling purported factual errors in Williams' and ETE's public statements about the Merger.[283] According to the document, the supposed errors suggested that it was "rational[] [to] conclude there has been a deliberate attempt to deceive public investors on the part of the directors of [Williams] and the investment banks that advised them."[284] Armstrong met with Bumgarner in person to discuss the document,[285] which later evolved[286] into a federal securities class action complaint filed by Bumgarner.[287]

Before filing the federal complaint, Bumgarner emailed his lawyer, with Armstrong blind-carbon-copied, and asked, "when can we file ? how can we also join/help the Delaware cases ?"[288] On December 26, 2015, Armstrong also answered various factual questions from Bumgarner related to the joint press release.[289] Bumgarner filed the lawsuit against Williams and ETE on January 14, 2016, alleging federal securities violations and seeking to enjoin the Merger.[290] After filing the

---

[283] JTX-0273.0001.
[284] *Id.* at .0004.
[285] JTX-0275; JTX-0276.
[286] Trial Tr. at 932:22–9:33:10(Bumgarner).
[287] *See generally* JTX-0368.
[288] JTX-0300.0003. This presumably referred to cases seeking to enjoin the Merger.
[289] JTX-0320.
[290] JTX-0368.0018.

47

lawsuit, Bumgarner continued to correspond with Armstrong about facts related to the Merger.[291]

Bumgarner also obtained a copy of Armstrong's notes to himself regarding the S-4, and he emailed a document to the Wall Street Journal that mirrored the structure and substance of those notes.[292] Armstrong testified at his deposition[293] and at trial that he did not recall supplying those notes to Bumgarner, though he "t[ook] responsibility" at trial for the fact that Bumgarner "got ahold of th[e] document[].["294] Bumgarner also sought Armstrong's review of a draft letter to the SEC reporting purported misleading statements and omissions in the S-4.[295]

Armstrong testified that he did not try to help Bumgarner with the lawsuit, and merely attempted to "educate him on the synergies" and "show him where all the public information was."[296] Likewise, Bumgarner testified that Armstrong did not help with the lawsuit, had nothing to do with Bumgarner's decision to sue, and told Bumgarner that he did not "have a very good case."[297] Bumgarner also testified that Armstrong "played it straight," behaved like a "Boy Scout," and "represented the company."[298]

---

[291] JTX-0522; Trial Tr. at 947:14–19(Bumgarner); *id.* at 668:10–13(Armstrong).
[292] *Compare* JTX-0223, *with* JTX-0252.
[293] Armstrong Dep. at 156:13–161:7 (2019).
[294] Trial Tr. at 631:3–14(Armstrong)
[295] JTX-0801.
[296] Trial Tr. at 626:3–627:2(Armstrong).
[297] *Id.* at 906:15–20(Bumgarner); *id.* at 970:20–23(Bumgarner); *id.* at 971:15–972:3(Bumgarner).
[298] *Id.* at 910:20–22(Bumgarner).

Ultimately, Bumgarner's claims were each dismissed or settled before the agreed-upon June 28, 2016 Closing Date. On April 28, 2016, several of Bumgarner's claims were dismissed,[299] and his remaining claims were settled on June 16, 2016.[300]

Although the evidence demonstrates that Armstrong's communications with Bumgarner were intended to assuage concerns about the Merger synergy disclosures, Armstrong did communicate anti-merger sentiments to others that were then relayed to Bumgarner.[301] In a December 22, 2015 email, Keith Bailey, Williams' former CEO, wrote to Bumgarner, "[h]eard this morning that Alan [Armstrong] told the guy I had breakfast with that he had a 7/6 majority the night before. That the activist investors threatened to sue if the deal wasn't approved and that flipped the two directors. . . . Alan also told this guy that at the December board meeting he 'unloaded' on the directors who supported the deal for being cowards."[302] However, when Bailey encouraged Armstrong to "give [ETE] the out" to make it easier to address potential credit issues at Williams, Armstrong demurred, stating that he preferred "other levers . . . to address ratings agency concerns."[303]

---

[299] *Bumgarner*, 2016 WL 1717206, at *6.
[300] JTX-1295.
[301] *See* JTX-0313.0001.
[302] *Id.*
[303] JTX-0369.0001.

Bailey subsequently authored two letters to Williams stockholders encouraging them to vote down the Merger.[304]

7. <u>Williams Encourages Its Stockholders to Approve the Merger</u>

Although some Williams directors and executives continued to question the merits of the Merger during the energy market tohubohu,[305] the record demonstrates that Williams worked to obtain stockholder approval of the Merger and pressed towards closing.

On November 24, 2015, the Williams Board recommended that Williams stockholders vote for the Merger.[306] As I noted above, after the energy market began to deteriorate, the Williams Board issued a press release on January 15, 2016 announcing that it was "unanimously committed to completing the transaction with [ETE] per the [M]erger [A]greement . . . as expeditiously as possible and delivering the benefits of the transaction to Williams' stockholders."[307] Williams publicly reaffirmed this position on February 17, 2016,[308] although two directors expressed disagreement internally about the use of the word "unanimous," which they described as "trickery."[309] Williams also sued ETE on April 6 and May 13, 2016, seeking specific performance of the Merger Agreement, and issued press releases in

---

[304] JTX-0580; JTX-1244.
[305] *See supra* at 26–27.
[306] Stip. ¶ 33.
[307] JTX-0379.0001.
[308] JTX-0553.0004.
[309] JTX-0545.0001.

connection with those lawsuits stating that the Williams Board was "unanimously committed to enforcing its rights under the merger agreement."[310]

On May 24, 2016, the parties filed an updated S-4 with the SEC.[311] In the S-4, the Williams Board recommended that stockholders vote for the Merger, though it disclosed that certain Williams directors voted against the Merger and "continue . . . to disagree with the recommendation of" the majority of the Williams Board.[312] On May 25, 2016, Williams scheduled a special stockholder meeting to vote on the Merger and reaffirmed that Williams "remain[ed] committed to holding the stockholder vote and closing the transaction as soon as possible."[313] On June 15, 2016, Williams restated its recommendation that the stockholders approve the Merger.[314] The Williams Board committee that was responsible for overseeing the Merger also conducted a week-long investor roadshow during which they made in-person visits and phone calls to discuss the Merger with institutional investors and other stockholders.[315]

---

[310] JTX-0826.0001; *see also* JTX-0935.0001; JTX-1179.0001.
[311] JTX-1218.
[312] *Id.* at .0029–.0031.
[313] JTX-1221.0001.
[314] JTX-1287.
[315] Trial Tr. at 61:14–23(Chappel); Sugg Dep. at 334:21–335:9.

On June 27, 2016, Williams held a special meeting of its stockholders to approve the combination with ETE.[316] Over 80% of votes cast were in support of the Merger.[317]

### 8. Latham Declines to Render the 721 Opinion

The Merger ultimately failed to close due to the failure of a condition precedent: Latham's determination that it could not render the 721 Opinion. This determination ultimately became the basis for my decision in 2016 declining to enjoin ETE from terminating the Merger Agreement.[318]

At trial in 2016, ETE's head of tax, Brad Whitehurst, testified that he had an "epiphany" in March 2016 that the precipitous drop in the value of ETE's units during the market turmoil could trigger a tax liability.[319] Whitehurst testified that, when reviewing the draft S-4 in March 2016, he realized for the first time that the number of ETC shares that ETE would receive in exchange for the $6 billion cash component—the hook stock—was fixed, not floating.[320] He testified that he believed the fixed nature of the hook stock could pose a potential Section 721 issue, and therefore brought the issue to Latham's attention.[321]

---

[316] Stip. ¶ 33.
[317] *Id.*
[318] *See generally Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017).
[319] *Williams Cos.*, 2016 WL 3576682, at *12.
[320] JTX-1304.0038 at 150:19–151:23 (Whitehurst 2016 trial testimony).
[321] JTX-1304.0041 at 162:23–163:22 (Whitehurst 2016 trial testimony).

The record in this trial proved Whitehurst's 2016 testimony to be false. Instead, it was Darryl Krebs, a vice president in ETE's tax department who reported to Whitehurst, who first identified that the hook stock was fixed. Krebs testified that when he reviewed the S-4 in March 2016, he noticed that ETE's hook stock appeared to be fixed at 19% of ETC shares.[322] This "stuck out to [Krebs] as a little surprising," so he raised it with Whitehurst, who reported back to Krebs a week later that the hook stock was indeed fixed at 19% of ETC shares.[323] Whitehurst therefore asked Krebs to "think about it and see if there's any other implications."[324]

On March 28, 2016, Krebs emailed Whitehurst with the subject line, "Disaster or Opportunity," and wrote that he "was thinking about the ETC share issue some more and another potential issue occurred to [him]."[325] Krebs raised the possibility that the hook stock could pose "a disguised sale issue under [Section] 721," and asked whether Latham had "looked at / evaluated this potential outcome in their 721 [O]pinion."[326] He recommended that Latham assess this issue, and added that if Latham could not issue the 721 Opinion, "we can't meet all of the conditions required to complete the merger," and Williams "will either have to renegotiate or

---

[322] Trial Tr. at 1080:20–1081:17(Krebs); *id.* at 1162:8–17(Whitehurst).
[323] *Id.* at 1081:11–1082:12(Krebs); *id.* at 1162:8–1165:7(Whitehurst).
[324] *Id.* at 1082:13–18(Krebs); *id.* at 1164:18–1165:7(Whitehurst).
[325] JTX-0757.0001.
[326] *Id.*

the merger can't be completed."[327]  Krebs concluded his email by observing that "[m]aybe there is a silver lining to the issue identified today."[328]

The next day, on March 29, 2016, Whitehurst called a Latham tax partner, Tim Fenn, and asked that Latham investigate the issue.[329]  Latham then undertook an "all hands on deck" analysis, during which it "pull[ed] in all of the associates in Houston to start working on the transaction and doing research."[330]  In April 2016, Latham devoted over 1,000 hours to the Section 721 issue.[331]  Another partner at Latham who worked on the matter, Larry Stein, described the task as "among the most intense, if not the most intense process" he had experienced in his entire career.[332]  While conducting its analysis, Latham participated in six calls with ETE's deal counsel, Wachtell, to "pressure test" Latham's analysis.[333]  Stein and Fenn each testified that these conversations with Wachtell reinforced Latham's confidence in its analysis that the 721 Opinion was problematic.[334]

In addition, on April 7, 2016, ETE retained William McKee, a tax attorney at Morgan Lewis & Bockius ("Morgan Lewis"), to provide a second opinion and

---

[327] *Id.*
[328] *Id.*
[329] Trial Tr. at 1462:1–13(Fenn); *id.* at 1129:24–1130:7(Whitehurst).
[330] *Id.* at 1465:1–16(Fenn); *id.* at 1360:10–24(Stein).
[331] *Id.* at 1465:1–1466:12(Fenn).
[332] *Id.* at 1360:10–24(Stein); *id.* at 1468:10–1469:2(Fenn).
[333] JTX-0837; JTX-0847; JTX-0848; JTX-0876; JTX-0892; JTX-0990; Trial Tr. at 1372:19–1373:20(Stein); *id.* at 1435:9–1436:1(Stein); *id.* at 1485:23–1488:5(Fenn).
[334] Trial Tr. at 1372:19–1373:20(Stein); *id.* at 1485:23–1488:22(Fenn).

determine whether there was a solution to the Section 721 issue.[335]  McKee concluded on April 11, 2016 that he would not be able to render a should-level 721 Opinion, albeit for reasons different than Latham's.[336]  McKee then discussed his conclusion with Latham.[337]

On April 12, 2016, Latham reached a "tentative conclusion" that it could not render the 721 Opinion, and then informed Williams' deal counsel at Cravath.[338]  Less than three hours later, Cravath called Latham, disagreeing with Latham's conclusion, and stating that it believed it could render a "will-level" 721 Opinion.[339]  Cravath also discussed the issue with McKee the next day, at Whitehurst's request.[340]

Despite disagreeing with Latham's assessment, Cravath proposed two alternatives to Latham on April 14, 2016 that it contended would resolve the Section 721 issue.[341]  Latham analyzed these proposals and, after consulting with Wachtell and Morgan Lewis,[342] determined that neither proposal would solve the

---

[335] *Id.* at 1137:18–1138:3(Whitehurst); JTX-1306.0060 at 568:20–570:21 (McKee 2016 trial testimony).

[336] JTX-1306.0061 at 574:2–14 (McKee 2016 trial testimony).

[337] Trial Tr. at 1484:23–1485:10(Fenn); *id.* at 1372:21–1373:20(Stein); *id.* at 1437:22–1438:8(Stein); *id.* at 1147:13–20(Whitehurst).

[338] JTX-1531; Trial Tr. at 1376:18–1377:15(Stein); Stip. ¶ 28.

[339] JTX-0881.0001; JTX-0884.0001.

[340] JTX-1306.0062 at 578:10–582:2 (McKee 2016 trial testimony); Trial Tr. at 1143:15–1144:2(Whitehurst).

[341] JTX-0950.

[342] Trial Tr. at 1386:4–1391:11(Stein); *id.* at 1488:6–13(Fenn); JTX-0990; JTX-0877.0013–.0014; JTX-0993; JTX-1119.

issue.[343] Latham reasoned that, because the proposals would not alter the economics of the deal (which Cravath acknowledged[344]), they would conflict with a line of tax cases declining to give weight to non-economic amendments to transactions made solely to avoid taxation.[345]

On April 18, 2016, the parties filed an Amendment to the Form S-4, stating that "Latham & Watkins LLP has recently advised ETE that if the closing of the merger were to occur as of the date of this proxy statement/prospectus it would not be able to deliver the 721 Opinion."[346]

In late April 2016, Williams sought its own second opinion from Eric Sloan of Gibson, Dunn & Crutcher.[347] After three weeks of analysis, Sloan initially determined that "it is tough to get to a should,"[348] though he concluded the next day in a "close call"[349] that he would be able to render a "weak should."[350]

On May 13, 2016, Williams sued ETE seeking to enjoin it from terminating the Merger Agreement based on the failure of the 721 Opinion, which I denied on

---

[343] Trial Tr. at 1379:13–1384:2(Stein); *id.* at 1481:21–1482:18(Fenn); *id.* at 1151:18–24(Whitehurst); JTX-0986.0002–.0003; *Williams Cos.*, 2016 WL 3576682, at *15–16.
[344] Trial Tr. at 1008:1–4(Needham); JTX-1304.0015 at 58:8–17 (Van Ngo 2016 trial testimony).
[345] *See Comm'r v. Ct. Holding Co.*, 324 U.S. 331 (1945); Trial Tr. at 1380:16–1382:6(Stein); *id.* at 1404:12–1407:3(Stein); *id.* at 1440:22–1441:11(Stein); *id.* at 1150:6–1151:3(Whitehurst).
[346] Stip. ¶ 29.
[347] JTX-1053.
[348] Trial Tr. 1052:5–8(Needham); JTX-1170.0001.
[349] JTX-1199.0002.
[350] JTX-1177.0001.

June 24, 2016 after trial.[351] In my post-trial opinion denying specific performance, I found that Latham's determination that it would be unable to deliver the 721 Opinion was made in good faith and was not improperly motivated by any pressure from ETE to avoid closing the Merger.[352] I further held that because the 721 Opinion was a condition precedent to closing, Williams was not entitled to an injunction prohibiting ETE from terminating the Merger Agreement after the passage of the Closing Date.[353]

### 9. ETE Terminates the Merger After the Failure of the 721 Opinion

Williams and ETE had agreed to meet on June 28, 2016 at 9:00 AM to close the Merger.[354] On June 28, 2016 at 9:00 AM, counsel for both parties met at the offices of Wachtell, ETE's counsel, with the necessary authority and all paperwork to close, except for the 721 Opinion.[355] The parties agree that Williams was ready, willing, and able to close on June 28, 2016.[356] Counsel for ETE, however, informed Williams that ETE would not close and would instead rely on the failure of the condition precedent of Latham's 721 Opinion.[357] Both before the market opened and after it closed on June 28, 2016, Latham sent ETE and Williams letters indicating

---

[351] *Williams Cos.*, 2016 WL 3576682, at *2, 21.
[352] *Id.* at *16.
[353] *Id.* at *21.
[354] Stip. ¶ 34.
[355] *Id.* ¶ 35.
[356] *Id.* ¶ 36.
[357] *Id.*

that it could not deliver the 721 Opinion at those times.[358]  On June 29, 2016, ETE terminated the Merger Agreement due to the passage of the Outside Date under Section 7.01(b)(i) of the Merger Agreement.[359]

*C. The Plaintiff Brings These Actions*

This matter first came to me on April 6, 2016, when Williams filed an expedited complaint challenging the Preferred Offering.[360]  Williams also filed a lawsuit in Texas state court against Warren on the same day, also challenging the Preferred Offering and contending that it constituted tortious interference with the Merger Agreement.[361]  The Texas lawsuit was dismissed on May 24, 2016 because it conflicted with a forum selection clause in the Merger Agreement.[362]  On April 19, 2016, Williams filed an amended complaint in this matter.[363]  ETE filed counterclaims on May 3, 2016.[364]

On May 13, 2016, Williams initiated a separate action in this Court seeking to enjoin ETE from terminating the Merger Agreement due to the failure of the 721 Opinion.[365]  On May 24, 2016, the Defendants filed amended affirmative defenses

---

[358] *Id.* ¶ 37.
[359] *Id.* ¶ 38; *Williams Cos.*, 2017 WL 5953513, at *8.
[360] Verified Compl., Dkt. No. 1, Apr. 6, 2016.
[361] JTX-0819.
[362] JTX-1220.
[363] Verified Am. Compl., Dkt. No. 48.
[364] Def.'s Answer Pl.'s Verified Am. Compl., Affirmative Defenses, and Original Verified Countercl., Dkt. No. 58.
[365] Verified Compl., Dkt. No. 1, May 13, 2016.

and counterclaims, addressing both actions in this Court.[366] On June 14, 2016, I ordered that the parties consolidate briefing and scheduling of the two actions to litigate the issues concurrently.[367] I held a two-day expedited trial in both actions on June 20 and 21, 2016 in Georgetown.

On June 24, 2016, I issued a post-trial memorandum opinion denying Williams' request to enjoin ETE from terminating the Merger because Latham's inability to deliver a 721 Opinion was a failure of a condition precedent under the Merger Agreement.[368] On June 27, 2016, the same day that Williams stockholders approved the Merger, Williams appealed, and the Supreme Court affirmed my Opinion in relevant part on March 23, 2017.[369]

The parties thereafter filed amended claims and counterclaims.[370] On December 1, 2017, I granted Williams' motion to dismiss ETE's counterclaims in part, denying ETE's request for a breakup fee for the terminated Merger.[371] I denied ETE's motion for reargument of that decision on April 16, 2018.[372] On January 14, 2020, the parties filed cross-motions for summary judgment on the remaining

[366] Defs.' and Countercl. Pls.' Am. Affirmative Defenses and Verified Countercl., Dkt. No. 79.
[367] Scheduling and Coordination Order, Dkt. No. 101.
[368] *See generally Williams Cos.*, 2016 WL 3576682.
[369] *Williams Cos.*, 159 A.3d; *see also* JTX-1327.0001.
[370] Verified Am. Compl., Dkt. No. 215; Defs.' and Countercl. Pl.'s Second Am. and Suppl. Affirmative Defenses and Verified Compl., Dkt. No. 219.
[371] *See generally Williams Cos.*, 2017 WL 5953513.
[372] *See generally Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2018 WL 1791995 (Del. Ch. Apr. 16, 2018).

claims, which "centered largely on Williams' right to the WPZ Termination Fee Reimbursement."[373] ETE filed a motion for sanctions on May 20, 2020 (the "Motion for Sanctions").[374] I issued an opinion on July 2, 2020 denying summary judgment but resolving certain non-dispositive contractual issues, and I held that the Motion for Sanctions was best dealt with at trial or a separate evidentiary hearing.[375]

I held a six-day trial in May 2021. The parties submitted post-trial briefing,[376] and I heard oral argument on September 17, 2021. On September 23, 2021, the parties submitted flowcharts outlining their claims, counterclaims, and defenses,[377] and I considered the matter fully submitted as of that date.

## II. ANALYSIS

### A. Legal Standards

The disputes in this case primarily concern the application of the Merger Agreement. "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[378] In practice, the objective theory of contracts requires the

---

[373] *Williams Cos., Inc. v. Energy Transfer LP*, 2020 WL 3581095, at *10 (Del. Ch. July 2, 2020).
[374] Defs. and Countercl. Pls.' Mot. Sanctions or, Alternatively, an Evidentiary Hearing Spoliation Evid., Dkt. No. 503 [hereinafter "Motion for Sanctions"].
[375] *Williams Cos.*, 2020 WL 3581095, at *21.
[376] Williams OB; ETE OB; Pl.'s and Countercl.-Def.'s Posttrial Reply Br., Dkt. No. 640; Defs.' and Countercl. Pls.' Reply Br. Supp. Its Countercl., Dkt. No. 645.
[377] *See* Dkt. Nos. 651, 652.
[378] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

court to effectuate the parties' intent,[379] which, absent ambiguity, "must be ascertained from the language of the contract."[380] In other words, "[t]he Court will interpret clear and unambiguous terms according to their ordinary meaning."[381]

Where a contract is ambiguous, however, the Court "must look beyond the language of the contract to ascertain the parties' intentions."[382] "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[383] Instead, "ambiguity exists '[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.'"[384]

### B. Williams Proved a Claim for the WPZ Termination Fee Reimbursement

In my summary judgment opinion, I held that the Merger Agreement permitted Williams the opportunity to recover the WPZ Termination Fee Reimbursement even though ETE validly terminated the Merger due to the failure of Latham's 721 Opinion.[385] Section 5.06(f) of the Merger Agreement allocates the risk regarding the WPZ Termination Fee Reimbursement as follows:

---

[379] *Zimmerman v. Crothall*, 62 A.3d 676, 690 (Del. Ch. 2013).
[380] *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008) (quoting *In re IAC/InterActive Corp.*, 948 A.2d 471, 494 (Del. Ch. 2008)).
[381] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).
[382] *Id.* (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).
[383] *Id.*
[384] *Id.* (quoting *Eagle Indus.*, 702 A.2d at 1232).
[385] *Williams Cos.*, 2020 WL 3581095, at *11–14.

61

> *If* the Company or Parent terminates this Agreement
> pursuant to (A) Section 7.0l(b)(ii), (B) Section 7.01(d) or
> (C) Section 7.01(b)(i) *and*, at the time of any such
> termination pursuant to this clause (C) any condition set
> forth in Section 6.01(b), 6.01(c), 6.01(d), 6.01(e), 6.03(a),
> or 6.03(b) shall not have been satisfied, *then*, in each case,
> Parent shall reimburse the Company for $410.0 million
> (the "WPZ Termination Fee Reimbursement") . . . . The
> Company agrees that in no event shall the Company be
> entitled to receive more than one WPZ Termination Fee
> Reimbursement.[386]

ETE terminated the Merger Agreement under § 7.01(b)(i) due to the passage of the Outside Date.[387] Therefore, ETE is liable to Williams for the WPZ Termination Fee Reimbursement if "any condition set forth in Section 6.01(b), 6.01(c), 6.01(d), 6.01(e), 6.03(a), or 6.03(b)" was unsatisfied at the time ETE terminated the Merger Agreement.[388] Thus the parties allocated the risk of a failed merger in light of Williams' payment of the WPZ termination fee to facilitate the Merger.

Williams asserts that four conditions set forth in those sections were unmet at the time ETE terminated the Merger Agreement. First, Williams claims that ETE breached the Capital Structure Representation by issuing the Preferred Offering.[389] Section 6.03(a)(i) of the Merger Agreement required the Capital Structure

---

[386] JTX-0209.0059 (§5.06(f)) (emphasis added).
[387] *See Williams Cos.*, 2020 WL 3581095, at *7.
[388] JTX-0209.0059 (§5.06(f)).
[389] Williams OB § I.A.

Representation to be true as of the Closing Date "except for any immaterial inaccuracies."[390]

Second, Williams claims that ETE breached the Ordinary Course Covenant and three Interim Operating Covenants by issuing the Preferred Offering.[391] Third, Williams claims that ETE breached its obligation to use reasonable best efforts to consummate the Merger, based on the failure of the 721 Opinion.[392] Section 6.03(b) of the Merger Agreement required ETE to "perform[] or compl[y]" with the Ordinary Course Covenant, Interim Operating Covenants, and best efforts obligations by the time of closing "in all material respects."[393] Finally, Williams argues that ETE breached a representation that it knew of no facts that would prevent the Merger "from qualifying as an exchange to which Section 721(a) of the [tax] Code applies."[394] Section 6.03(a)(iv) required this representation to be true as of the Closing Date except where the failure of the representation to be true "would not reasonably be expected to have . . . a Parent Material Adverse Effect," as defined in the Merger Agreement.[395]

The parties agree that, subject to ETE's affirmative defenses, Williams is entitled to the WPZ Termination Fee Reimbursement if it prevails under any one of

---

[390] JTX-0209.0063 (§6.03(a)(i)).
[391] Williams OB § I.B.
[392] *Id.* § II.B. *See* JTX-0209.0053 (§5.03(a)), .0060 (§5.07(a)).
[393] JTX-0209.0063 (§6.03(b)).
[394] Williams OB § II.A. *See* JTX-0209.0038 (§3.02(n)(i)).
[395] JTX-0209.0063 (§6.03(a)(iv)).

these four theories.  As explained below, I find that the Preferred Offering breached at least the Ordinary Course Covenant, the Interim Operating Covenants, and the Capital Structure Representation.  I therefore need not consider whether ETE separately breached its obligations with respect to the failure of the 721 Opinion.

*C. ETE Breached the Ordinary Course Covenant and Interim Operating Covenants*

As described above, ETE agreed to several covenants restricting its actions between signing and closing—the Ordinary Course Covenant and three Interim Operating Covenants.  In my summary judgment opinion, I held that "the Preferred Offering did not comport with the requirements set forth in the operating covenants."[396]  Two issues were left for trial:  First, whether ETE's violation of these covenants was excused under the "in all material respects" qualifier, and second, whether the Preferred Offering was nonetheless permitted under the $1 Billion Equity Issuance Exception in the Parent Disclosure Letter.[397]

I discuss both in turn.

1. The Preferred Offering Did Not Comply with the Interim Operating Covenants and Ordinary Course Covenant "In All Material Respects"

Section 6.03(b) of the Merger Agreement required, by the time of closing, ETE to have "performed or complied" with the operating covenants "in all material

---

[396] *Williams Cos.*, 2020 WL 3581095, at *18.
[397] *Id.* at *18–20.

respects."[398] ETE argues that the "in all material respects" qualifier adopts the common law "material breach" standard.[399] That is incorrect.

This Court has consistently interpreted the qualifier "in all material respects" to be "less onerous" for the party asserting breach than the common law material breach standard. In *Akorn, Inc. v. Fresenius Kabi AG*, Vice Chancellor Laster examined the meaning of the "in all material respects" qualifier in a merger agreement.[400] The Court reviewed treatises on M&A agreements and case law interpreting the word "material" and determined that "in all material respects" "limit[s] the operation of the [covenants to which it applies] to issues that are *significant in the context of the parties' contract*, even if the breaches are not severe enough to excuse a counterparty's performance under a common law [material breach] analysis."[401]

The Court therefore held that the "in all material respects" qualifier "calls for a standard that is different and less onerous than the common law doctrine of material breach": It is meant to "exclude small, *de minimis*, and nitpicky issues that should not derail an acquisition."[402] Since *Akorn*, this Court has repeatedly endorsed that meaning of the "in all material respects" qualifier in the context of merger

---

[398] JTX-0209.0063 (§6.03(b)).
[399] ETE OB § III.A.3.a.
[400] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *84–86 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018).
[401] *Akorn*, 2018 WL 4719347, at *84–86 (emphasis added).
[402] *Id.* at *85–86.

agreements.[403] And our Supreme Court recently adopted this interpretation in *AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC*.[404] ETE offers no reason to depart from that meaning here.

Applying the "in all material respects" standard as set forth in *Akorn*, I find that the Preferred Offering's violation of the operating covenants is not excused by that standard. The record at trial demonstrated that achieving economic equivalence between the ETC shares, which the former Williams stockholders would receive, and the ETE common units, was "paramount" to Williams[405] and became "the most important and time-consuming part of the[] negotiations."[406] As Warren admitted at trial, "equality of distributions between ETC shares and ETE units was a key aspect of the merger."[407]

Of particular concern to Williams was the possibility that Warren, a significant ETE common unitholder who would control both ETE and ETC after the

---

[403] *Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, 2020 WL 4581674, at *26 (Del. Ch. Aug. 10, 2020) ("in all material respects" excludes those "small, *de minimis*, and nitpicky issues that should not derail an acquisition"); *Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*, 2021 WL 1714202, at *38 (Del. Ch. Apr. 30, 2021) (same); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *73 (Del. Ch. Nov. 30, 2020) (same), *aff'd*, 2021 WL 5832875 (Del. Dec. 8, 2021); *Channel Medsystems, Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at *17 (Del. Ch. Dec. 18, 2019) (applying *Akorn* standard); *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *134 n.426 (Del. Ch. Aug. 31, 2020) (distinguishing "material breach" standard from "in all material respects" standard), *aff'd sub nom. Cigna Corp. v. Anthem, Inc.*, 251 A.3d 1015 (Del. 2021) (TABLE).
[404] 2021 WL 5832875, at *13 (Del. Dec. 8, 2021).
[405] *See supra* note 38 and accompanying text.
[406] *See supra* note 40 and accompanying text.
[407] *See supra* note 38 and accompanying text.

Merger, could take actions that benefitted ETE unitholders at the expense of ETC.[408]

That is precisely what the Preferred Offering achieved. The Preferred Offering guaranteed participants a cash distribution preference of 11 cents, plus an additional 17½ cents in accrual credits, regardless of whether any distributions were made to common unitholders.[409] This had the effect of eliminating downside risk for participants in the event of a distribution cut, which ETE had anticipated since January 2016,[410] months before the Preferred Offering closed on March 8, 2016.[411]

Moreover, ETE made the Preferred Offering available only to ETE insiders, with Warren, McReynolds and Davis receiving over 85% of the total preferred units.[412] And on the Closing Date—the relevant date for the purpose of assessing materiality[413]—ETE had in fact declared that if the Merger closed, it would cut distributions on common units to zero for two years.[414] As one of ETE's financial advisors at Perella remarked, such a distribution cut "represent[ed] a wealth transfer from non-participating to participating units."[415]

---

[408] *See supra* note 36 and accompanying text.
[409] Trial Tr. 371:20–373:1(Warren); JTX-0535.0019; JTX-0538.0002; Trial Tr. 351:1–352:10(Warren).
[410] *See supra* notes 123–24, 128–29, 150–51 and accompanying text.
[411] *See supra* note 208 and accompanying text.
[412] *See supra* note 213 and accompanying text.
[413] JTX-0209.0063 (§6.03(b)).
[414] *See supra* notes 241–42, 257 and accompanying text.
[415] *See supra* note 186 and accompanying text.

For these reasons, I found in the *Unitholder* action that the Preferred Offering "was a hedge meant to protect [ETE] insiders from the anticipated bad effects of the coming merger"—an "opportunity to eliminate downside risk" that ETE "insiders seized" "for themselves and their cronies."[416]  Indeed, by transforming the ETE common units held by insiders into preferred units, ETE gained the ability to cut distributions to zero on ETE common units, along with its matching obligation regarding ETC dividends,[417] while shielding its own insiders from the downside. That is, ETE was able to preserve distributions to ETE insiders while cutting out (among others) the former Williams stockholders.  And as of the Closing Date, that is exactly what ETE planned to do.[418]  To Williams, the Preferred Offering destroyed the economic equivalence between the ETC shares and certain ETE units, and it signaled that Warren was willing to take actions adverse to ETC if they benefited him.  That is hardly the type of picayune issue immaterial to a Merger where, as Warren himself admitted, "equality of distributions between ETC shares and ETE units was a key aspect."[419]

---

[416] *Energy Transfer*, 2018 WL 2254706, at *1, 24.
[417] *See supra* note 42 and accompanying text.
[418] *See supra* notes 241–42, 257–59 and accompanying text.
[419] *See supra* note 39 and accompanying text.

ETE advances several arguments that, despite representing a wealth transfer to ETE insiders, the Preferred Offering complied with the operating covenants "in all material respects." I find none of them persuasive.

First, ETE contends that the distribution preference was ultimately "of no consequence" to Williams because the Merger never closed.[420] But ETE's obligation to pay the WPZ Termination Fee Reimbursement is only triggered if the Merger failed to close.[421] If ETE's argument was correct, Williams' right to recover the WPZ termination fee would be meaningless and unenforceable. Indeed, as I have already held, "the benefits of § 5.06(f) would be illusory if (as ETE argues) the termination . . . relieved ETE of all the conditions that could trigger the WPZ Termination Fee Reimbursement."[422]

Second, ETE contends that Williams was better off with the Preferred Offering than it would have been if ETE had undertaken a contractually compliant

---

[420] ETE OB § III.A.3.b.i.

[421] JTX-0209.0059 (§5.06(f)).

[422] *Williams Cos.*, 2020 WL 3581095, at *13. None of ETE's cited cases are to the contrary. *Matthew v. Laudamiel* applied the common law materiality standard, which I have already held is more onerous. 2014 WL 5499989, at *2 (Del. Ch. Oct. 30, 2014). In *Great Lakes Chem. Corp. v. Pharmacia Corp.*, the holding to which ETE refers had nothing to do with materiality. 788 A.2d 544, 549–50 (Del. Ch. 2001). Rather, the court there held that the plaintiff failed to allege that the injury was caused by the breach. *Id.* Here, in contrast, I have already held at summary judgment that causation is irrelevant because the Merger Agreement "contains no causal language that suggests that to trigger the WPZ Termination Fee Reimbursement, the termination must result from the unsatisfied condition." *Williams Cos.*, 2020 WL 3581095, at *12. Finally, *Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.* dealt with the question of damages, not materiality. 2018 WL 4057012, at *12 (Del. Ch. Aug. 27, 2018).

equity issuance, such as an issuance of common units.[423]  In particular, ETE contends that an issuance of common units would have been "more dilutive to Williams."[424] But the diversion of cash flow from Williams stockholders to ETE insiders is a distinct harm beyond the dilutive effect of an issuance of common units.  Williams agreed to some dilution in connection with the $1 Billion Equity Issuance Exception, but it did not agree that ETE could divert distributions to ETE insiders while cutting out Williams stockholders.[425]

Third, ETE argues that the Preferred Offering did not disrupt any of Williams' contractual "economic equivalence rights."[426]  Specifically, ETE argues that the Merger Agreement only guaranteed equivalence between dividends on ETC shares and distributions on ETE *common units*, not ETE senior securities.[427]  But this proves too much; by creating a new class of securities to transfer wealth from common unitholders to those other, favored, common unitholders allowed to participate in the offering, ETE destroyed the equivalence between Williams stockholders and the latter group of common unitholders.  ETE next argues it could have issued the very same Preferred Offering after closing.[428]  That may be true, but is not pertinent.  Regardless of what ETE could have done after closing relieved it

---

[423] ETE OB § III.A.3.b.ii.
[424] *Id.* at 66.
[425] *See infra* § II.C.2.
[426] ETE OB § III.A.3.b.iii.
[427] *Id.*
[428] *Id.*

of its contractual duties, its obligation was to comply with the operating covenants at closing.[429] If ETE's ability to act inconsistently with its operating covenants post-closing excused its obligation to comply with them pre-closing, that obligation would be rendered nugatory.

Finally, ETE argues that any dilution to Williams stockholders caused by the Preferred Offering paled in comparison to the entire agreement's value, and that Williams demonstrated that the breach was immaterial by seeking to close the Merger regardless.[430] At summary judgment, I rejected the general "proposition that a party's willingness to proceed with an agreement must mean that any violations did not matter to it."[431] I instead cast the issue as a factual one for trial: "did Williams' perfervid desire to proceed despite the alleged breaches indicate that it found ETE's alleged violations immaterial?"[432]

The evidence shows that Williams found ETE's violations material. Multiple Williams witnesses testified that they viewed the Preferred Offering as an "outrageous"[433] "sweetheart deal" for "the CEO of ETE and some small[,] selected group of people"[434] that was "a complete game changer with respect to what was

---

[429] JTX-0209.0063 (§6.03(b)).
[430] ETE OB § III.A.3.b.iv.
[431] *Williams Cos.*, 2020 WL 3581095, at *14.
[432] *Id.* at *15.
[433] *See supra* note 219 and accompanying text.
[434] *See supra* note 221 and accompanying text.

71

bargained for in the merger agreement."[435] One Williams stockholder lambasted the Preferred Offering as "something similar" to a "fraudulent conveyance."[436] Williams also sued ETE in this Court and Warren personally in Texas state court challenging the Preferred Offering while it was seeking to close the Merger.[437] The record therefore demonstrates that Williams viewed the Preferred Offering to be material despite its continued desire to close. A party may find a breach material in light of its bargain, but still conclude that the transaction, net, is favorable. Such a determination does not void its right to a remedy for the breach as provided by contract under an "in all material respects" standard.

Accordingly, I find that Williams has proven that the Preferred Offering failed to comply "in all material respects" with the operating covenants.

### 2. The $1 Billion Equity Issuance Exception Does Not Excuse ETE's Breach

The Ordinary Course Covenant and each of the Interim Operating Covenants were subject to certain exceptions in Section 4.01(b) of the Parent Disclosure Letter. With respect to the Ordinary Course Covenant, the Merger Agreement provided that "[e]xcept as set forth in Section 4.01(b) of the Parent Disclosure Letter . . . Parent shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary

---

[435] *See supra* note 220 and accompanying text.
[436] *See supra* note 218 and accompanying text.
[437] *See supra* notes 360–61 and accompanying text.

course . . . ."[438]  Likewise, each of the Interim Operating Covenants is preceded by an identical "except as set forth in Section 4.01(b) of the Parent Disclosure Letter" preamble.[439]

Section 4.01(b) of the Parent Disclosure Letter, in turn, organizes these exceptions under headers that correspond to specific sections within Section 4.01(b) of the Merger Agreement.[440]  The $1 Billion Equity Issuance Exception falls under a header titled, "Section 4.01(b)(v)."[441]

The parties dispute whether the $1 Billion Equity Issuance Exception creates an exception to the Ordinary Course Covenant and all of the Interim Operating Covenants, or just the Interim Operating Covenant located within Section 4.01(b)(v) of the Merger Agreement, which prohibited the issuance of equity securities.  As discussed below, I find that both interpretations are reasonable, and therefore, the "except as set forth in Section 4.01(b) of the Parent Disclosure Letter" qualifier in the Merger Agreement is ambiguous.

ETE argues that the "[e]xcept as set forth in Section 4.01(b) of the Parent Disclosure Letter" language in the Merger Agreement qualifies each of the operating covenants, meaning that ETE could disregard any of them if it did so in connection

---

[438] JTX-0209.0045 (§4.01(b)).
[439] Id. at .0045 (§4.01(b)).
[440] JTX-0194.0017–.0019.
[441] Id. at .0018.

73

with an action permitted by Section 4.01(b) of the Parent Disclosure Letter.[442]  I find this interpretation to be reasonable.  I note that the "[e]xcept as set forth in Section 4.01(b) of the Parent Disclosure Letter" language is repeated twice—once before the Ordinary Course Covenant, and once before the Interim Operating Covenants.[443] Because Section 4.01(b) of the Parent Disclosure Letter contains no header corresponding to the Ordinary Course Covenant, it would be reasonable to apply all of the exceptions in Section 4.01(b) of the Parent Disclosure Letter to the Ordinary Course Covenant; otherwise, the qualifier that precedes the Ordinary Course Covenant would have no meaning.  And if the phrase "[e]xcept as set forth in Section 4.01(b) of the Parent Disclosure Letter" creates an unqualified exception to the Ordinary Course Covenant, it is reasonable to conclude that, when the identical phrase appears again in front of the Interim Operating Covenants, it creates an identical unqualified exception to those covenants.

I also note that the Parent Disclosure Letter states, "[t]he headings contained in this Parent Disclosure Letter are for reference only and shall not affect in any way the meaning or interpretation of this Parent Disclosure Letter."[444]  It is therefore reasonable to disregard the headers—including numerical designations—in the

---

[442] ETE OB § III.A.2.a.
[443] JTX-0209.0045 (§4.01(b)).
[444] JTX-0194.0002.

Parent Disclosure Letter referring to specific sections within Section 4.01(b) of the Merger Agreement when interpreting the scope of the exceptions.

On the other hand, Williams argues that the exceptions in Section 4.01(b) of the Parent Disclosure Letter are limited by the numerical designations in each of their headers, such that the exceptions only qualify the covenants in the Merger Agreement that correspond to those numerical designations.[445]  This, too, I find a reasonable interpretation.  Through the headers, each exception in Section 4.01(b) of the Parent Disclosure Letter refers to a single covenant within Section 4.01(b) of the Merger Agreement.[446]  And the substance of each exception matches the substance of the corresponding operating covenant.  For example, the $1 Billion Equity Issuance Exception falls under the header "Section 4.01(b)(v)," which corresponds to a covenant in Section 4.01(b)(v) that prohibits the issuance of equity.[447]  And Section 3.02 of the Merger Agreement explicitly provides that each exception applies to its corresponding section or subsection in the Merger Agreement.[448]

Moreover, the headers are not ordered consecutively.  For example, although there are headers titled, "4.01(b)(ii)" and "4.01(b)(v)," there are no headers titled,

---

[445] Williams OB § I.B.2.
[446] JTX-0194.0017–.0019.
[447] *Compare id.* at.0018 (Parent Disclosure Letter), *with* JTX-0209.0045(Merger Agreement).
[448] JTX-0209.0030 (§3.02).

"4.01(b)(iii) or "4.01(b)(iv)."[449] The nonconsecutive numbering of the headers indicates that the exceptions under each header are meant to refer specifically to the section in the Merger Agreement matching the header. Furthermore, Section 4.01(b) of the Parent Disclosure Letter repeats certain exceptions under multiple headers.[450] If each exception applied to all the operating covenants in Section 4.01(b) of the Merger Agreement, there would be no need for such repetition. Williams' proposed interpretation is also consistent with the phrase "[e]xcept as set forth in Section 4.01(b) of the Parent Disclosure Letter," which could reasonably be read to simply refer the reader to Section 4.01(b) of the Parent Disclosure Letter to determine whether there any exceptions to a particular covenant.

Because I find that both interpretations are reasonable, it is appropriate to examine the extrinsic evidence to determine the parties' intent. As I discussed above, the parties' drafting history demonstrates that they intended the $1 Billion Equity Issuance Exception, which fell under a header titled, "Section 4.01(b)(v)," to qualify only the Interim Operating Covenants in Section 4.01(b)(v) of the Merger Agreement. Up until the day before signing, the $1 Billion Equity Issuance Exception was located *within Section 4.01(b)(v) of the Merger Agreement*, not the Parent Disclosure Letter.[451] Witnesses aligned with both parties testified that they

---

[449] JTX-0194.0017–.0019.
[450] *Id.* at .0018–.0019 (§4.01(b)(v)(4), (x)(1), (xi)(4)); *id.* at .0017, .0019 (§4.01(b)(ii)(1), (xi)(3)).
[451] *See supra* notes 67–72 and accompanying text.

76

only moved it to the Parent Disclosure Letter—along with several other exceptions—to maintain confidentiality, and that they did not intend the moves to be substantive.[452]

The parties' conduct after signing also confirms that they intended this interpretation. Williams' Company Disclosure Letter was structured in the same manner as the Parent Disclosure Letter, with exceptions that fell under headers that referred to specific sections within Williams' operating covenants in the Merger Agreement.[453] After signing, Williams planned its own equity issuance, which was permitted by an exception in its Company Disclosure Letter but featured a waiver on IDRs that was prohibited under another operating covenant.[454] Consistent with the view that the equity issuance exception in the Company Disclosure Letter did not permit the IDR waiver, Williams requested ETE's consent, and ETE exercised its right to refuse, a right that would have been nonexistent under ETE's current litigation-driven view of the language.[455] Accordingly, I find that the parties intended the $1 Billion Equity Issuance Exception to qualify the covenants within Section 4.01(b)(v) of the Merger Agreement, but not the other Interim Operating Covenants or the Ordinary Course Covenant.

---

[452] *See supra* notes 76–79 and accompanying text.
[453] *See supra* notes 83–85 and accompanying text.
[454] *See supra* notes 82–84, 86–87 and accompanying text.
[455] *See supra* notes 88–89 and accompanying text.

ETE next argues that, even if the $1 Billion Equity Issuance Exception refers only to the Interim Operating Covenants at Section 4.01(b)(v) of the Merger Agreement, it still cross-applies to other covenants, under the explicit terms of the Agreement, where its "relevan[ce]" to those covenants is "reasonably apparent on its face."[456]  ETE relies on the following provision of the Merger Agreement to support this argument:

> [A]ny information set forth in one Section or subsection of the Parent Disclosure Letter shall be deemed to apply to and qualify the Section or subsection of this Agreement to which it corresponds in number *and* each other Section or subsection of this Agreement to the extent that it is reasonably apparent on its face in light of the context and content of the disclosure that such information is relevant to such other Section or subsection[.][457]

Relying on the broad definition of "relevant" applicable to the Delaware Rules of Evidence, ETE argues for a similarly broad interpretation of this provision, to mean that an exception in the Parent Disclosure Letter applies to any covenant in the Merger Agreement that is "logically related to" that covenant.[458]  This reading ignores that the provision requires the "relevan[ce]" of the exception to be "reasonably apparent on [the] face" of the exception, which is clearly a limitation on the breadth of the provision.[459]  Indeed, in its briefing, ETE reads the "on its face"

[456] ETE OB § III.A.2.c.
[457] JTX-0209.0030 (§3.02) (emphasis added).
[458] ETE OB § III.A.2.c.
[459] JTX-0209.0030 (§3.02).

language out of the provision, describing it as the "reasonably apparent relevance" standard.[460] If ETE's reading were correct, the $1 Billion Equity Issuance Exception would permit violations of *any covenant* so long as the violation was done in connection with a compliant equity issuance. Accordingly, ETE argues that the "reasonably apparent on its face" provision permitted ETE to violate the Ordinary Course Covenant by engaging in a self-dealing transaction—the Preferred Offering—that breached ETE's own limited partnership agreement[461] because that transaction was an equity issuance of under $1 billion.[462] That is not a reasonable interpretation of the provision.

Instead, I find that the plain meaning of the provision—that contract language shall apply cross-sectionally where it is reasonably apparent on its face that the language is relevant cross-sectionally—excuses actions that would otherwise breach covenants where *facially necessary* to permit the activity provided by the provision—that is, where absent cross-sectional applicability an inconsistency in the contractual terms would result. For example, another exception under the "Section 4.01(b)(v)" header in the Parent Disclosure Letter allows ETE to "acquire units in any of its Subsidiaries in an amount up to $2.0 billion in the aggregate."[463] It is

---

[460] *See* ETE OB at 60 ("The text of the 'reasonably apparent . . . relevance' clause . . . ."); *id.* at 61 ("Under the 'reasonably apparent relevance' standard . . . .").
[461] *Energy Transfer*, 2018 WL 2254706, at *25.
[462] *See* ETE OB at 61.
[463] JTX-0194.0018 (§4.01(b)(v)(3)).

"reasonably apparent on [the] face" of this exception that it must cross-apply to the covenant in Section 4.01(b)(iv) of the Merger Agreement, which states that ETE may not "purchase, redeem or otherwise acquire any shares of . . . its Subsidiaries' capital stock or other securities."[464]   Otherwise, the exception would have no meaning.   This interpretation of the "reasonably apparent on its face" provision comports with the ordinary meaning of the word "relevant,"[465] and gives effect to the requirement that the exception's relevance to a covenant be "reasonably apparent on [the] face" of the exception.[466]   In other words, the provision is a savings clause for a draftsperson's failure to adequately cross-reference a provision in the Merger Agreement.[467]

Applying this standard, the "relevan[ce]" of the $1 Billion Equity Issuance Exception to the covenants ETE violated is not "reasonably apparent on [the] face" of the exception, because ETE could have undertaken an equity issuance pursuant to the exception that complied with each of the covenants.   Because ETE could have acted in compliance with the covenants without the application of the exception, its relevance to the covenants is not facially apparent.   Again, I held at summary judgment that the Preferred Offering did not comport with ETE's general Ordinary

---

[464] JTX-0209.0045 (§4.01(b)(iv)).
[465] *Relevant*, MERRIAM-WEBSTER ("having significant and demonstrable bearing on the matter at hand").
[466] JTX-0209.0030 (§3.02).
[467] *See* Trial Tr. 215:3–216:1(Van Ngo).

Course Covenant because "breaching its limited partnership agreement is not 'ordinary course' for the company."[468] ETE does not dispute that it could have structured the equity offering in a way that did not breach its partnership agreement. And ETE also concedes that "ETE issued equity securities in the past, and it was reasonably expected to do so during the Merger's pendency."[469] In other words, ETE admits that certain equity issuances were ordinary course. Accordingly, the $1 Billion Equity Issuance Exception is not facially relevant to the Ordinary Course Covenant, because it is unnecessary to address a conflict with that covenant.

Likewise, I held at summary judgment that the Preferred Offering breached ETE's covenants that it would not (i) subject ETE to new distribution restrictions, (ii) issue "securities in respect of . . . equity securities," or (iii) amend its partnership agreement.[470] Again, ETE could have structured an equity offering in a way that complied with each of those covenants. As a result, the relevance of the Equity Issuance Exception to each is not facially apparent. For example, as ETE concedes, equity issuances do not necessarily feature distribution restrictions.[471] And if ETE had issued equity out of the existing classes instead of swapping common units for new preferred units, it would have complied with the covenant prohibiting ETE from

---

[468] *Williams Cos.*, 2020 WL 3581095, at *18.
[469] ETE OB at 61.
[470] *Williams Cos.*, 2020 WL 3581095, at *18.
[471] ETE OB at 61.

issuing "securities in respect of . . . equity securities." Finally, ETE does not dispute that it could have issued common units without amending its limited partnership agreement.[472] Simply put, none of the operating covenants breached by ETE conflicted with the $1 Billion Equity Issuance Exception. Therefore, the exception's relevance to those covenants was not "reasonably apparent on its face." Accordingly, I find that the $1 Billion Equity Issuance Exception did not permit ETE's violations of its operating covenants.

*　　*　　*

Because I have found that Williams proved a claim for the WPZ Termination Fee Reimbursement based on ETE's breach of the operating covenants, I need not discuss Williams' other independent bases for proving its claim.[473]

I note, however, that Williams has also established a claim for the WPZ Termination Fee Reimbursement based on the failure of the Capital Structure Representation. Pursuant to the Capital Structure Representation, ETE represented at signing that its capital structure consisted of three classes of equity securities:

> The authorized equity interests of Parent consist of common units representing limited partner interests in Parent ("Parent Common Units"), Class D Units representing limited partner interests in Parent ("Parent

---

[472] ETE argues only that it would have to amend its partnership agreement to issue "new securities." *Id.* at 62.

[473] Those bases generally involve the 721 Opinion.

Class D Units") and a general partner interest in Parent ("Parent General Partner Interest").[474]

This representation was brought down to closing "except for any immaterial inaccuracies."[475] In my summary judgment opinion, I held that, because the Preferred Offering created a fourth class of equity that was part of ETE's capital structure on the Closing Date, the Capital Structure Representation was false on that date.[476] As with the covenant breaches, two issues were left for trial: first, whether that inaccuracy was "immaterial," and second, whether the $1 Billion Equity Issuance Exception in the Parent Disclosure Letter permitted the inaccuracy.[477]

I find that Williams proved that the falsity of the Capital Structure Representation was material. In the context of representations in merger agreements, this Court has held that "[a] fact is generally thought to be 'material' if [there] is 'a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"[478] As I held above, the Preferred Offering was material to Williams stockholders because it created a new equity class that granted ETE insiders a distribution preference, allowing ETE to preserve cash flow to those

---

[474] JTX-0209.0030 (§3.02(c)(i)).
[475] *Id.* at .0063 (§6.03(a)).
[476] *Williams Cos.*, 2020 WL 3581095, at *4, 20–21.
[477] *Id.* at *20–21.
[478] *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *38 (Del. Ch. Apr. 29, 2005); *accord Akorn*, 2018 WL 4719347, at *86.

insiders while cutting out the Williams stockholders.[479] I therefore find that the Preferred Offering rendered the Capital Structure Representation materially inaccurate.

Furthermore, the $1 Billion Equity Issuance Exception did not permit the falsity of the Capital Structure Representation. Unlike the operating covenants, the Capital Structure Representation is not qualified by the "except as set forth in Section 4.01(b) of the Parent Disclosure Letter" preamble.[480] Accordingly, the only way that the $1 Billion Equity Issuance Exception could apply to the Capital Structure Representation is through the "reasonably apparent on its face" test.[481] For reasons similar to the related discussion above, the exception's applicability is not facially apparent, because there is no inconsistency in the language. ETE promised that its existing classes of equity would carry down to closing, but its representation concerning the number of outstanding *units* for each class was not so brought down.[482] In other words, ETE was free to issue up to $1 billion in equity out of an existing class, as provided for in the Parent Disclosure Letter, and in that case the Capital Structure Representation would have remained true at closing. Because ETE could have issued equity under the $1 Billion Equity Issuance Exception in a way

---

[479] *See supra* § II.C.1.
[480] *See* JTX-0209.0030 (§3.02(c)(i)).
[481] *See id.* at .0030 (§3.02).
[482] *Id.* at .0063 (§6.03(a)(i)).

84

that complied with the Capital Structure Representation, it is not facially apparent that the exception is applicable to the Capital Structure Representation.

Accordingly, I find that Williams has independently proven a claim for the WPZ Termination Fee Reimbursement based on the Preferred Offering's violation of the Capital Structure Representation. Having found that Williams proved a claim for the WPZ Termination Fee Reimbursement, I turn to ETE's affirmative defenses.

### D. ETE's Affirmative Defenses and Counterclaims Fail

ETE asserts three affirmative defenses and counterclaims that it contends prevent Williams from recovering the WPZ Termination Fee Reimbursement. First, ETE argues that Williams violated a provision requiring cooperation with respect to financing by refusing the Proposed Public Offering.[483] Second, ETE argues that Williams breached an obligation to notify ETE of purportedly material omissions from the S-4.[484] Third, ETE contends that Williams breached various obligations based on the purported actions taken by Armstrong and the dissenting Williams directors to thwart the Merger.[485]

"[A] defendant seeking to . . . assert [a] breach as an affirmative defense [to performance] . . . bears the burden to show that [the] breach . . . excused its non-

---

[483] ETE OB § III.C.1.
[484] *Id.* § III.C.2.
[485] *Id.* § III.C.3.

performance."[486]  As discussed below, I find that ETE has failed to prove each of these affirmative defenses and counterclaims.

### 1. ETE Did Not Prove That Williams Violated the Financing Cooperation Provision

ETE argues that by refusing to consent to the Proposed Public Offering, Williams breached its obligation under Section 5.14 of the Merger Agreement to "provide cooperation reasonably requested by [ETE] that is necessary or reasonably required in connection with . . . financing . . . arranged by [ETE]."[487]  ETE contends that Section 5.14 provides "no reasonableness qualifier" on Williams' duty to provide cooperation.[488]  I disagree.  Section 5.14 provides that Williams was only required to "provide cooperation *reasonably requested by* [ETE]."[489]  Williams was therefore under no obligation to cooperate with a request by ETE that was unreasonable.

It is reasonable for "a party [to] withhold consent to a transaction when the decision is made for a legitimate business purpose."[490]  The record demonstrated that Williams withheld consent to the Proposed Public Offering on the advice of its financial advisors because it discriminated against Williams stockholders, who were

---

[486] *TA Operating LLC v. Comdata, Inc.*, 2017 WL 3981138, at *22 (Del. Ch. Sept. 11, 2017).
[487] ETE OB § III.C.1.
[488] *Id.* at 95.
[489] JTX-0209.0061 (§5.14) (emphasis added).
[490] *Union Oil Co. of California v. Mobil Pipeline Co.*, 2006 WL 3770834, at *11 (Del. Ch. Dec. 15, 2006).

unable to participate in the offering.[491]  I find this to be a legitimate business purpose, particularly given that, instead of merely withholding consent, Williams offered to proceed with the offering if ETE allowed Williams stockholders to participate.[492] That was a reasonable counteroffer, which ETE refused.[493]  Moreover, "an obligation to take reasonable actions . . . does not require a party 'to sacrifice its own contractual rights for the benefit of its counterparty.'"[494]  The Proposed Public Offering violated the Merger Agreement for many of the same reasons that the Preferred Offering did—including because it involved new distribution restrictions and issued "securities in respect of . . . equity securities."[495]  I therefore find that it was reasonable for Williams to refuse to consent to the Proposed Public Offering.

## 2. ETE Did Not Prove a Disclosure Violation

ETE next contends that Williams breached its obligation under Section 5.01 of the Merger Agreement to inform ETE of material facts omitted from the S-4 and to correct those omissions.[496]  In particular, ETE contends that Williams did not disclose to ETE (i) the purported threats of consent solicitation from Meister and

---

[491] *See supra* notes 187–92 and accompanying text.
[492] *See supra* note 196 and accompanying text.
[493] *See supra* note 197 and accompanying text.
[494] *Williams Field Servs. Grp., LLC v. Caiman Energy II, LLC*, 2019 WL 4668350, at *34 (Del. Ch. Sept. 25, 2019) (quoting *Akorn*, 2018 WL 4719347, at *91), *aff'd sub nom. Williams Field Servs. Grp., LLC v. Caiman Energy II, LCC*, 237 A.3d 817 (Del. 2020).
[495] *See supra* at 28–33, 81–82.
[496] ETE OB § III.C.2.

Mandelblatt, and (ii) certain Williams directors' criticism of its bankers' financial analyses.[497]  Section 5.01 of the Merger Agreement provides, in relevant part,

> If at any time prior to receipt of the Company Stockholder Approval any information relating to TopCo, Parent or the Company, or any of their respective Affiliates, directors or officers, should be discovered by TopCo, Parent or the Company which is required to be set forth in an amendment or supplement to either the Form S-4 or the Proxy Statement, so that either such document would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, the party that discovers such information shall promptly notify the other parties hereto and an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and, to the extent required by Law, disseminated to the stockholders of the Company.[498]

First, as discussed above, ETE failed to prove that Meister and Mandelblatt threatened the Williams directors with a consent solicitation, or that any perceived threats influenced the Williams Board's decision to approve the Merger Agreement.[499]  Williams was under no obligation to inform ETE of threats that did not occur.  Second, Williams disclosed that a minority of its directors voted against entering into the Merger Agreement and "continue to disagree with the recommendation of the majority of the [Williams] Board";[500] it was not required to

---

[497] *Id.* § III.C.2.
[498] JTX-0209.0051 (§5.01).
[499] *See supra* at 20–22.
[500] JTX-1218.0165.

disclose "the ground for a disclosed director dissent," including any purported disagreement with the analysis of Williams' bankers.[501] Accordingly, ETE has failed to prove a breach of Section 5.01.

### 3. Any Breach by Williams of the Best Efforts or Ordinary Course Provisions Was Cured by the Closing Date

Finally, ETE argues that Williams breached three covenants based on the actions of Armstrong and other dissenting Williams directors: Williams' obligations to (i) use reasonable best efforts to consummate the Merger;[502] (ii) "carry on its business in the ordinary course";[503] and (iii) use "reasonable best efforts to contest and resist" litigation challenging the Merger.[504] Williams was obligated to have "performed or complied" with these covenants "by the time of the Closing."[505]

ETE contends that Williams breached these covenants because Armstrong "covertly worked with anti-Merger co-conspirators."[506] As I have found, however, Armstrong's communications with Bumgarner, while not a model of corporate governance best practices, were intended to assuage Bumgarner's concerns about the synergies estimates, not to thwart the Merger.[507]

---

[501] *Newman v. Warren*, 684 A.2d 1239, 1246 (Del. Ch. 1996).
[502] JTX-0209.0053 (§5.03(a)).
[503] *Id.* at .0041 (§4.01(a)).
[504] *Id.* at .0053 (§5.03(a)).
[505] *Id.* at .0063 (§6.02(b)).
[506] ETE OB at 98.
[507] *See supra* § I.B.6.

ETE also contends that Armstrong and other dissenting Williams directors tried to "fan the deal break flames" by attempting to dissuade Cleveland and Stoney from supporting the Merger, positioning Williams for a "walkaway payment," "working the press" to "write anti-ETE articles," and suing Warren "in a thinly-veiled publicity stunt."[508]  The evidence at trial refuted each of these contentions. ETE introduced no evidence that Cleveland or Stoney felt pressured to switch their votes; to the contrary, Stoney testified that she never felt pressure to reconsider her position.[509]  Moreover, although Williams did ask its financial advisors to assess the value of a potential breakup fee from ETE,[510] the Williams Board resolved to publicly support the Merger,[511] and ultimately sued to enjoin ETE from terminating the Merger Agreement.[512]  And ETE has introduced no evidence that Williams' Texas lawsuit against Warren challenging the Preferred Offering was intended to be a "publicity stunt."  Instead, the lawsuit represented Williams' view that the Preferred Offering breached the Merger Agreement and was unfair to Williams stockholders.

In any event, and more fundamentally, Williams' obligation to comply with these covenants was due "by the time of the Closing."[513]  And by June 28, 2016, the

---

[508] ETE OB at 102.
[509] *See supra* note 138 and accompanying text.
[510] *See supra* note 142 and accompanying text.
[511] *See supra* notes 139, 307–08, 310, 312–14 and accompanying text.
[512] *See supra* note 351 and accompanying text.
[513] JTX-0209.0063 (§6.02(b)).

date on which Williams and ETE had agreed to close,[514] Williams was in full compliance: Williams had settled the Bumgarner lawsuit,[515] sued ETE seeking to enjoin it from terminating the Merger Agreement,[516] obtained stockholder approval of the Merger,[517] and showed up at the scheduled closing.[518] Indeed, ETE concedes that on June 28, 2016, Williams was ready, willing and able to close.[519] Therefore, even to the extent that, between signing and closing, the actions of Armstrong and the dissenting Williams directors violated covenants, Williams "had abandoned its flirtation" with those violations by the time of closing, "thereby curing its breach."[520]

Accordingly, I find that ETE failed to prove any of its affirmative defenses or counterclaims.

### E. ETE Is Entitled to Monetary Sanctions for Armstrong's Deletion of His Gmail Account

On May 20, 2020, ETE filed the Motion for Sanctions based on Armstrong's deletion of the Gmail account he used to correspond with Bumgarner about the Merger.[521] ETE asks the Court to make adverse findings, draw adverse inferences,

---

[514] *See supra* note 50 and accompanying text.
[515] *See supra* notes 299–300 and accompanying text.
[516] *See supra* note 351 and accompanying text.
[517] *See supra* note 317 and accompanying text.
[518] *See supra* note 355 and accompanying text.
[519] Stip. ¶ 36.
[520] *Akorn*, 2018 WL 4719347, at *100.
[521] *See generally* Motion for Sanctions.

91

award ETE attorneys' fees and costs, and prohibit Williams from recovering attorneys' fees and costs.[522]

"The Court has the power to issue sanctions for discovery abuses under its inherent equitable powers, as well as the Court's 'inherent power to manage its own affairs.'"[523] "Sanctions serve three functions: a remedial function, a punitive function, and a deterrent function."[524] With these functions in mind, the Court considers the following factors in determining whether sanctions are appropriate: (1) "the culpability or mental state of the party who destroyed the evidence"; (2) "the degree of prejudice suffered by the complaining party"; and (3) "the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the conduct in the future."[525] "The Court has wide latitude to fashion an appropriate remedy, but the remedy must be tailored to the degree of culpability of the spoliator and the prejudice suffered by the complaining party."[526]

With respect to the first element, I find that Armstrong's destruction of his Gmail account was spoliation of evidence. Although Armstrong testified at trial that he deleted the Gmail account because it was sending spam messages to his

---

[522] *Id.* ¶ 1.
[523] *Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1189 (Del. Ch. 2009) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002)).
[524] *Id.*
[525] *Id.*
[526] *Id.* at 1189–90.

92

contacts,[527] Williams failed to introduce any evidence corroborating that testimony—such as an example of the spam emails. Given this lack of corroborating evidence, and the fact that Armstrong deleted the account just two days after being asked at a deposition if he emailed with Bumgarner about the Merger,[528] I do not find his testimony to be credible.

Turning to the second element, however, ETE has failed to demonstrate that Armstrong's destruction of his Gmail account ultimately prejudiced ETE. ETE was able to recover Armstrong's communications with Bumgarner by subpoenaing Bumgarner's emails.[529] Although ETE acknowledges this, it argues that Bumgarner discarded most of his paper records, which may have included handwritten notes from Armstrong, as well as Bumgarner's notes from meetings with Armstrong.[530] But even if true, ETE fails to explain how those handwritten notes would have been recoverable through Armstrong's deleted Gmail account. ETE also points out that Armstrong communicated with Williams' former CEO, Bailey,[531] and that he testified that he may have done so from that Gmail account.[532] But "an email, almost by definition, has a sender and a receiver."[533] Therefore, "[e]ven if [Armstrong] had

---

[527] *See supra* note 280 and accompanying text.
[528] *See supra* note 279 and accompanying text.
[529] *See supra* note 282 and accompanying text.
[530] ETE OB § III.C.5.
[531] *See supra* notes 301–03 and accompanying text.
[532] Trial Tr. 688:9–689:11(Armstrong).
[533] *Beard Rsch*, 981 A.2d at 1193 (declining to draw adverse inference based on deletion of emails).

destroyed certain emails [to Bailey] on his end, the emails still would exist on the other end and [c]ould have been produced."[534]

With respect to the third element, I find that making adverse inferences or findings would be unfair to Williams in light of ETE's lack of prejudice. Sanctions in some form, however, are appropriate given Armstrong's degree of culpability. I therefore find that ETE is entitled to recover its fees and costs in connection with subpoenaing Bumgarner's email, and for bringing the Motion for Sanctions.

*F. Williams Is Entitled to Attorneys' Fees and Costs, and Interest*

Section 5.06(g) of the Merger Agreement provides that Williams is entitled to fees, costs, and interest if it is forced to bring a suit to collect the WPZ Termination Fee Reimbursement and prevails:

> [I]f . . . Parent fails promptly to pay any amount due pursuant to Section . . . 5.06(f), and, in order to obtain such payment, . . . the Company commences a suit that results in . . . a judgment against Parent for the amount set forth in Section . . . 5.06(f) . . . Parent shall pay to the Company . . . the other party's costs and expenses (including reasonable attorneys' fees and expenses) in connection with such suit, together with interest on the amount of such payment from the date such payment was required to be made until the date of payment at the prime rate as published in the *Wall Street Journal* in effect on the date such payment was required to be made.[535]

---

[534] *Id.*
[535] JTX-0209.0059 (§5.06(g)).

Because I have found that Williams is entitled to the WPZ Termination Fee Reimbursement, Williams is also entitled to recover its reasonable fees and expenses in bringing about this result.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of the Plaintiff in the amount of $410 million, plus interest at the contractual rate, and its reasonable attorneys' fees and expenses. The Defendants are entitled to their fees and expenses for subpoenaing Bumgarner's documents and bringing their Motion for Sanctions. The parties should confer and submit a form of order consistent with this Opinion.